United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCO DIMERCURIO, et al.,
Plaintiffs,

v.

EQUILON ENTERPRISES LLC,
Defendant.

Case No. 19-cv-04029-JSC

**ORDER RE: CLASS CERTIFICATION**

Re: Dkt. Nos. 89, 90, 100, 102

Plaintiffs are operators at a Shell oil refinery owned by Equilon Enterprises, LLC ("Defendant" or "Shell"). They allege that Defendant's standby practices violate California's wage-and-hour laws, Unfair Competition Law, and Private Attorneys General Act. Before the Court is Plaintiffs' motion for class certification.[1] (Dkt. No. 90.)[2] Having carefully reviewed the parties' briefing, and having had the benefit of oral argument on August 26, 2021, the Court GRANTS the motion in part for the reasons explained below.

**FACTUAL BACKGROUND**

Defendant owned and operated a Shell oil refinery located at 3485 Pacheco Boulevard in Martinez, California. (Dkt. No. 27 ¶ 2.) The refinery employed about 300 people as "operators."[3] (Dkt. No. 4 ¶ 14.) There were two operator positions: "outside operators" and "inside operators." (Dkt. No. 90-21 ¶ 6; Dkt. No. 90-22 ¶ 6; Dkt. No. 90-23 ¶ 6; Dkt. No. 90-24 ¶ 6.) All inside operators were qualified as outside operators, although outside operators were not necessarily

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 12, 13.)

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[3] This figure represents the number at one point in time, in July 2019. (Dkt. No. 4 ¶ 14.)

qualified as inside operators. (Dkt. No. 90-21 ¶ 7; Dkt. No. 90-23 ¶ 7; Dkt. No. 90-24 ¶ 7.) Operators qualified to perform both positions might switch between the roles as regularly as every week or month. (Dkt. No. 90-21 ¶ 8; Dkt. No. 90-22 ¶ 8; Dkt. No. 90-23 ¶ 8; Dkt. No. 90-24 ¶ 8.) Operator duties included opening and closing valves, starting and stopping pumps, taking chemical samples, responding to refinery emergencies like fires, operating compressors and turbines, maintaining chemical inventory, blending gasoline, controlling water levels and chemicals in tanks, and loading and discharging material from ships arriving on the refinery wharf. (Dkt. No. 90-21 ¶ 3; Dkt. No. 90-22 ¶ 3; Dkt. No. 90-23 ¶ 3; Dkt. No. 90-24 ¶ 3.) Their duties supported the refinery's functions of importing crude oil, synthesizing it into gasoline, exporting gasoline out of the refinery, processing oil byproducts into intermediate gasoline, and converting petroleum byproducts into petroleum coke. (Dkt. No. 90-23 ¶ 3; Dkt. No. 90-21 ¶ 3; Dkt. No. 90-22 ¶ 3.)

The refinery ran 24 hours a day, seven days a week. (Dkt. No. 90-21 ¶ 9; Dkt. No. 90-22 ¶ 9; Dkt. No. 90-23 ¶ 9; Dkt. No. 90-24 ¶ 9.) Operators generally worked 12-hour shifts, either the day shift between 6:00 a.m. and 6:00 p.m., or the night shift between 6:00 p.m. and 6:00 a.m. (Dkt. No. 4 ¶ 12.) Shifts were organized in a 28-day cycle. (*Id.*) The cycle included a series of three to four night shifts (or day shifts), followed by around two days off; then a series of three to four day shifts (or night shifts), followed by around two days off; and so on. (*Id.*; Dkt. No. 90-10 at 6:1-10; Dkt. No. 90-21 ¶ 10; Dkt. No. 90-22 ¶ 10; Dkt. No. 90-23 ¶ 10; Dkt. No. 90-24 ¶ 10.) The cycle included at least one full unscheduled week called a "long change." (Dkt. No. 4 ¶ 12; Dkt. No. 90-10 at 6:17–7:19; Dkt. No. 90-21 ¶ 10; Dkt. No. 90-22 ¶ 10; Dkt. No. 90-23 ¶ 10; Dkt. No. 90-24 ¶ 10.)

Refinery employees were organized into departments. (Dkt. No. 90-21 ¶ 8; Dkt. No. 90-22 ¶ 8; Dkt. No. 90-23 ¶ 8; Dkt. No. 90-24 ¶ 8.) Each department divided operators into four "teams" or "workgroups": Team One, Team Two, Team Three, and Team Four. (Dkt. No. 90-21 ¶ 8; Dkt. No. 90-22 ¶ 8; Dkt. No. 90-23 ¶ 8; Dkt. No. 90-24 ¶ 8.) Each numbered team in each department worked the same schedule; for example, Team Four in the Operations Central Department worked the same schedule as Team Four in the Coking Department and in other departments. (Dkt. No.

90-21 ¶¶ 8, 11; Dkt. No. 90-22 ¶¶ 8, 11; Dkt. No. 90-23 ¶¶ 8, 11; Dkt. No. 90-24 ¶¶ 8, 11.)

**I. Collective Bargaining Agreements**

Operators were members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"). (Dkt. No. 4 ¶¶ 3, 6.) Their terms and conditions of employment at Shell were governed by various collective bargaining agreements ("CBAs"), supplemental agreements, and "side letters" with the USW. (*Id.* ¶ 7.) The CBA dated February 1, 2015 ("2015 CBA") was effective from February 1, 2015 through January 31, 2019. (*Id.* ¶ 8.) Its appendices included the September 23, 1997 12-Hour Shift Agreement ("1997 Supplemental Agreement"), including the "Standby Coverage and Requirements" attachment, and the July 8, 1999 Supplemental Shift Agreement, 12-Hour Schedules ("1999 Supplemental Agreement"). (*Id.*) The CBA dated February 1, 2019 ("2019 CBA") was effective beginning February 1, 2019. (*Id.* ¶ 10.) Its appendices included the 1997 Supplemental Agreement and 1999 Supplemental Agreement. (*Id.*) The standby provisions of the 1997 Supplemental Agreement were effective throughout the entire class period as a supplement to the 2015 CBA or 2019 CBA. (Dkt. No. 90-6 at 4:10-16; Dkt. No. 90-9 at 4:9-14; Dkt. No. 90-10 at 9:6-9, 17:12-17.)

The 1997 Supplemental Agreement states, in relevant part:

> All employees will be required to cooperate fully to provide coverage for short notice unscheduled absences of employees. . . .
>
> [R]egardless of the amount of notice, should other established coverage practices not result in coverage, the standby process may be used. . . .
>
> Standby personnel must be available during the period extending 30 minutes prior to and one hour after the beginning of the shift for which designated as the standby. Standby period on day shift – 5:30 am until 7:00 am. Standby period on night shift – 5:30 pm until 7:00 pm.
>
> Should a standby operator be required to report to work, and subsequently the regular operator report for duty prior to being considered AWOL (as defined by the Attendance Management Policy), the standby operator may be sent home and paid for his/ her time in accordance with the call-out pay guidelines.
>
> Standby personnel must provide a telephone number at which they can be reached during the standby period and/or will be expected to carry a pager in the event they are not able to be reached directly by

> telephone. Prompt response to Company contact is required of standby personnel. . . .
>
> Employees who are on standby for scheduled days off and who cannot be contacted will be considered Absent Without Leave and subject to disciplinary action.
>
> Standby personnel must be able to assume the duties for which they are called within a reasonable time period of being contacted to report for work. This time period is not to exceed two hours.

(Dkt. No. 4 at 92.) According to Shell, units or departments within the refinery might have had their own "guidelines" that supplemented or superseded the standby provisions in the 1997 Supplemental Agreement. (*Id.* ¶ 11.)

**II. Standby**

Consistent with the 1997 Supplemental Agreement, Shell had "mandatory standby processes" designed to fill "short notice, unscheduled absence[s]," meaning absences of which Shell was notified during the shift preceding the absence or later. (Dkt. No. 4 ¶ 12.) The processes "only appl[ied] when a department or work group [was] unable to fill a vacancy on a voluntary basis." (*Id.*)

Operators were on standby for a particular shift or set of shifts. The standby period was 5:30 a.m. to 7:00 a.m. for day shifts and 5:30 p.m. to 7:00 p.m. for night shifts. (Dkt. No. 4 at 92; Dkt. No. 90-5 at 8:21-28; Dkt. No. 90-8 at 4:23–5:4.) During the standby period, the operator did not need to call Shell or be at the refinery, (Dkt. No. 4 ¶ 12), but had to be reachable in case Shell called the operator to cover an unscheduled absence. (Dkt. No. 90-10 at 24:2-14, 25:8-12, 26:17-20.) If Shell called, according to the 1997 Supplemental Agreement, the operator had to respond promptly. (Dkt. No. 4 at 92.) If Shell told the operator to come in to cover an unscheduled absence, the operator had to arrive at the refinery within two hours. (Dkt. No. 4 at 92; Dkt. No. 90-10 at 26:13-24.) If called in, the standby operator worked the remainder of the shift (i.e., until 6:00 p.m. or 6:00 a.m.). The operator was paid the greater of (a) five hours at the regular hourly rate of pay or (b) the actual hours worked at 1.5 times the regular hourly rate of pay. (Dkt. No. 4 ¶ 12.) If not called in during the standby period, the standby operator was not paid. (Dkt. No. 90-5 at 5–6; Dkt. No. 90-7 at 9:3-24; Dkt. No. 90-10 at 29:16–30:1.) Operators who failed to answer a foreman's phone call during a standby shift were considered absent without leave ("AWOL") and

could be subject to discipline. (Dkt. No. 4 at 92; Dkt. No. 90-5 at 15:16-19; Dkt. No. 90-10 at 22:4-12, 27:19–28:13; Dkt. No. 110 at 11:1-10.) Operators were also subject to disciplinary investigation if they failed to arrive within two hours of receiving the foreman's call. (Dkt. No. 90-10 at 21:3-18.)

During the class period, all operators were subject to the standby process. (Dkt. No. 90-9 at 4:9-14; Dkt. No. 90-10 at 17:5-17.) Shell only placed an operator on standby during an operator's "long change" week. (Dkt. No. 4 ¶ 12.) Shell could not put an operator on standby who was on paid time off, on approved leave, or not on a "long change." (*Id.*) Over the course of a calendar year, each operator was typically assigned to at least two "long change" weeks with standby, with no standby on the remaining "long change" weeks. (Dkt. No. 90-21 ¶ 14; Dkt. No. 90-22 ¶ 14; Dkt. No. 90-23 ¶ 14; Dkt. No. 90-24 ¶ 14.) During the "long change" weeks with standby, the operator was on standby for all day and night shifts that week; however, if the operator was called in, then the operator would not be on standby for the shift immediately following. (Dkt. No. 90-21 ¶ 16; Dkt. No. 90-22 ¶ 16; Dkt. No. 90-23 ¶ 16; Dkt. No. 90-24 ¶ 16.)

In the four calendar years between 2015 and 2018, operators were on standby for a total of 12,243 shifts. (Dkt. No. 4 ¶ 15.)

**III. Plaintiffs and the Proposed Class**

Plaintiff Marco DiMercurio worked as an operator at Shell from July 2015 until at least April 2021. (Dkt. No. 90-21 ¶ 3.) Plaintiff Charles Gaeth worked as an operator at Shell from October 1990 until August 2020. (Dkt. No. 90-22 ¶ 3.) Plaintiff John Langlitz worked as an operator at Shell from 1990 until at least April 2021. (Dkt. No. 90-23 ¶ 3.) Plaintiff Malcolm Synigal worked as an operator at Shell from around 1994 until 2018. (Dkt. No. 90-24 ¶ 3.) During their employment as operators, all four Plaintiffs were members of the USW. (Dkt. No. 4 ¶¶ 6.) Plaintiffs experienced the standby practices described above. (Dkt. No. 90-21 ¶¶ 12–20; Dkt. No. 90-22 ¶¶ 12–20; Dkt. No. 90-23 ¶¶ 12–20; Dkt. No. 90-24 ¶¶ 12–20.) Plaintiffs forewent personal, recreational, and family activities and overtime opportunities when they were on standby. (Dkt. No. 90-21 ¶¶ 21–25; Dkt. No. 90-22 ¶¶ 21–25; Dkt. No. 90-23 ¶¶ 21–25; Dkt. No. 90-24 ¶¶ 21–25.)

20 other operators in the proposed class submit declarations that Shell's standby system functioned as described above. (Dkt. No. 90-17.) They attest that they were scheduled for standby during the full seven days of a "long change," at least twice a year; understood that they could be subject to discipline for missing a call during the standby period or failing to arrive at the refinery within two hours; and forewent personal, recreational, and family activities and overtime opportunities when they were on standby. (*Id.* at 5–6 ¶ 10, 7–9 ¶¶ 14–21, 14–15 ¶ 10, 16–18 ¶¶ 14–21, 23–24 ¶ 10, 25–27 ¶¶ 14–21, 31–32 ¶ 10, 33–35 ¶¶ 14–21, 39–40 ¶ 10, 41–43 ¶¶ 14–21, 48–49 ¶ 10, 50–52 ¶¶ 14–21, 56–57 ¶ 10, 58–60 ¶¶ 14–21, 64–65 ¶ 10, 66–68 ¶¶ 14–21, 74 ¶ 10, 75–77 ¶¶ 14–21, 82 ¶ 10, 83–85 ¶¶ 14–21, 90–91 ¶ 10, 92–94 ¶¶ 14–21, 99–100 ¶ 10, 101–02 ¶¶ 14–21, 108 ¶ 12, 109–11 ¶¶ 16–23, 117 ¶ 11, 118–20 ¶¶ 15–22, 124–25 ¶ 10, 126–27 ¶¶ 14–21, 133 ¶ 11, 134–36 ¶¶ 15–22, 141–42 ¶ 10, 143–45 ¶¶ 14–21, 150–51 ¶ 10, 152–54 ¶¶ 14–21, 158–59 ¶ 10, 160–62 ¶¶ 14–21, 166–67 ¶ 10, 168–70 ¶¶ 14–21.) During the class period, none of the declarants was designated AWOL for failing to answer a call during standby. Prior to the class period, one declarant received a letter of reprimand for failing to answer a call; another was designated AWOL for failing to answer a call; and another, who served as a USW shop steward, handled a grievance related to an operator's failure to answer a call. (*Id.* at 66 ¶ 16, 143 ¶ 16, 110 ¶ 18.)

**PROCEDURAL HISTORY**

In June 2019, Plaintiffs filed their original class action complaint in California state court with a claim for "Failure to Pay Reporting Time Pay" in violation of California Industrial Welfare Commission ("IWC") Wage Order 1-2001 and derivative claims for "Failure to Pay All Wages Earned at Termination" in violation of California Labor Code §§ 200-203; "Failure to Provide Accurate Wage Statements" in violation of Labor Code §§ 226, 226.3; and "Unfair Business Practices" in violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200. (Dkt. No. 1 at 19–31.) Defendant removed pursuant to the diversity jurisdiction provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d), and purported federal question jurisdiction under 28 U.S.C. § 1331. (*Id.* ¶¶ 2, 3.)

In the operative first amended complaint, Plaintiffs assert their previous claims and an

additional claim under California's Private Attorneys General Act, Labor Code § 2698. (Dkt. No. 18.) The Court denied Defendant's motion to dismiss. (Dkt. No. 26.) Plaintiffs now move to certify the following proposed class:

> All Operators working at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California at any time from June 4, 2015, four years prior to the filing of this complaint, up to and continuing through January 31, 2020.

(Dkt. No. 90 at 9.) Plaintiffs also propose a "Waiting Time Penalties Sub-Class":

> All Operators who have been employed and separated from employment (either by involuntary termination or resignation) at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California, at any time from June 4, 2015 through January 31, 2020, and who did not timely receive all their wages at time of separation.

(*Id.*)

## DISCUSSION

### I. Request for Judicial Notice

Defendant requests that the Court take judicial notice of a trial court order denying class certification in *Ward v. Tilly's*, No. BC595405 (Cal. Super. Ct. filed Sept. 21, 2015), and "[t]he September 21, 2018 releases of all wage-related claims against" Defendant by some putative class members, evidenced in six documents from the class action settlement in *Berlanga v. Equilon Enters., LLC*, No. 3:17-cv-00282-MMC (N.D. Cal. filed Jan. 19, 2017). (Dkt. No. 102.) Plaintiffs oppose. (Dkt. No. 112-1.)

As to the *Ward* order, (Dkt. No. 102 at 5–17), the Court takes judicial notice as a matter of public record not subject to reasonable dispute. *See Lee v. City of L.A.*, 250 F.3d 668, 689–90 (9th Cir. 2001). As to the *Berlanga* settlement, (Dkt. No. 102 at 19–377), the Court takes judicial notice of the adjudicative fact—that is, the existence and contents of the settlement—but not the settlement's legal effect on the merits of this case. *See Lee*, 250 F.3d at 689–90; *see also Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685 (9th Cir. 2019) (interpreting legal effect of prior class action settlement upon the rights of the parties).

**II. Class Certification**

"Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal court." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017). Plaintiffs must satisfy the threshold requirements of Rule 23(a) as well as the requirements under one of the subsections of Rule 23(b). *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588–89 (9th Cir. 2012). Under Rule 23(a), a case is appropriate for certification if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Plaintiffs contend that the putative class satisfies Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza*, 666 F.3d at 588 (internal quotation marks omitted).

**A. Rule 23(a)**

**1. Numerosity**

The putative class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (internal quotation marks and citation omitted). "While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012).

Plaintiffs estimate the class is 300 operators, making it impracticable to bring all class members before the Court on an individual basis. Their estimate relies on a list, produced by Defendant, of operators employed between July 14, 2015 and January 31, 2020—slightly narrower than the class period. (Dkt. No. 89-2.) Defendant argues that the estimate is overly broad because it may include operators who were not on 12-hour shifts, and thus did not have standby responsibilities, and operators whose claims are barred by the *Berlanga* settlement or the statute of limitations. However, these arguments do not reduce the putative class below the threshold for numerosity, as Defendant does not provide a figure lower than 300 or explain an alternative estimate. *Cf. Castillo v. Bank of Am., NA*, 980 F.3d 723, 732 n.3 (9th Cir. 2020) (noting, in Rule 23(b)(3) predominance analysis, that "a large portion of the proposed class was . . . never exposed to the challenged policy," where defendant estimated that 35.2 to 41.7 percent were not exposed). Moreover, one of Defendant's declarants separately estimated that Shell employed 300 operators at a single point in time, in July 2019, which suggests that a higher number might have been employed over the class period. (*See* Dkt. No. 4 ¶ 14.) And 20 members of the putative class, in addition to the four named Plaintiffs, attest that they were operators on 12-hour shifts during the class period. (Dkt. No. 90-17.) Accordingly, Plaintiffs have established that the class is sufficiently numerous.

**2. Commonality**

"[C]ommonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "[P]laintiff[s] must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Id.* (internal quotation marks and citation omitted). The commonality requirement is construed permissively and is "less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "Even a single common question of law or fact that resolves a central issue will be sufficient to satisfy this mandatory requirement for all class actions." *Castillo v.*

*Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020).

Plaintiffs satisfy the commonality requirement. Whether Defendant had a practice of requiring operators to be on standby for 1.5 hours and be able to arrive at the refinery within two hours, and whether that practice constitutes "report[ing] for work" under the IWC Wage Order, is a common question underlying every cause of action that is capable of common resolution for the class. *Compare Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 396 (C.D. Cal. 2008) (holding requirement met because "[t]here is at least one significant issue common to them: whether [defendant's] stated policies complied with California's reporting time and split shift regulations"), *with Morales v. New Albertsons, Inc.*, 2014 WL 10988341, at *5–6 (C.D. Cal. June 19, 2014) (holding requirement not met because "circumstances surrounding each class member's going to the store varied in aspects crucial to the question of whether that employee was reporting for work"). This central question goes to the heart of each cause of action and each class member's potential relief, satisfying the "limited burden" of commonality. *Mazza*, 666 F.3d at 589.

A sub-class may be appropriate for the waiting time penalties claim, which is discussed further below. (Dkt. No. 90 at 9.)

**3. Typicality**

"Typicality refers to the nature of the claim or defense of the class representative and not on facts surrounding the claim or defense." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. 2007) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotation marks and citation omitted). The typicality requirement serves as a "guidepost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5

(2011).

Plaintiffs' claims are typical because they arise out of Shell's uniform policy, at least on the record before the Court. *See Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) ("[Plaintiff's] claims arise from the same allegedly unlawful policy of using total hours worked in the divisor. For this reason, [plaintiff's] claims are reasonably co-extensive with the putative class members, and [she] has satisfied the requirement of typicality." (internal quotation marks omitted)). The CBA's standby provisions appear to be a uniform policy for operators on 12-hour shifts, and Plaintiffs have presented evidence that the policy was uniformly applied. (*See* Dkt. No. 90-17.) Defendant's arguments to the contrary, (*see* Dkt. No. 101 at 32), are unavailing as they stem from factual disputes that "go[] to the merits of the claims, not whether the named Plaintiffs' claims are typical of the class." *Johnson v. Serenity Transp., Inc.*, 2018 WL 3646540, at *7 (N.D. Cal. Aug. 1, 2018).

**4. Adequacy of Representation**

Like typicality, adequacy of representation ultimately concerns whether the class action device will protect the interests of absent class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011); Fed. R. Civ. P. 23(a)(4). Courts ask, "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the actions vigorously on behalf of the class?" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (citation omitted); *see also Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992) (noting that adequacy of representation "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive" (citation omitted)); Fed. R. Civ. P. 23(g)(1).

No conflicts between Plaintiffs and with other class members are apparent, and Plaintiffs' involvement in the suit, including as deponents, suggests they will vigorously prosecute the case. Defendant objects to Plaintiffs as class representatives based on their conduct in several discovery disputes. None of the issues raised suggest that Plaintiffs have "abdicated any role in the case beyond that of furnishing their names." *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 525

(C.D. Cal. 2012) ("While credibility is a relevant consideration with respect to the adequacy analysis, to show that a class representative is not adequate, credibility problems must relate to issues directly relevant to the litigation or . . . confirmed examples of dishonesty, such as a criminal conviction for fraud." (internal quotation marks and citations omitted)); *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) ("Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate.").

As to the adequacy of class counsel, the Court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A). Plaintiffs propose Weinberg, Roger & Rosenfeld A.P.C. and Leonard Carder LLP as class counsel. The former firm has represented Plaintiffs since the start and the latter appeared earlier this year to support class certification and the parties' settlement conference before a magistrate judge. Counsel are experienced with class action suits under California wage-and-hour law and have adequately prosecuted the case, including conducting successful outreach to 20 members of the proposed class. (*See* Dkt. No. 90-1 ¶¶ 3–7; Dkt. No. 90-20 ¶¶ 2, 15–16.) In addition to the discovery dispute conduct mentioned above, Defendant objects to appointing eight attorneys because only a few have appeared at hearings or depositions thus far, and because two are from a new firm. These arguments miss the mark. Eight attorneys is within the reasonable range for a case like this, and, contrary to Defendant's contention, assigning a smaller number of attorneys to cover hearings or depositions may be consistent with efficient and cost-effective representation of the class. *See Chalmers v. City of L.A.*, 796 F.2d 1205, 1210 (9th Cir. 1986) (explaining that reducing class counsel's requested attorneys' fees is appropriate "if the hours expended are deemed excessive or otherwise unnecessary").

In sum, given that Plaintiffs have no apparent conflicts of interest with other class

members, Plaintiffs are actively participating in the case, and Plaintiffs' counsel is highly experienced in class action wage-and-hour litigation, the adequacy requirement is met.

**B. Rule 23(b)(3)**

**1. Predominance**

"The focus of the predominance inquiry is whether a proposed class is sufficiently cohesive to warrant adjudication by representation. But the rule does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof, so long as one or more common questions predominate." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (internal quotation marks omitted) (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013)). "Considering whether 'questions of law or fact common to the class predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "[T]he Court identifies the substantive issues related to plaintiff's claims . . . ; then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried." *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 426 (N.D. Cal. 2013). Class certification "analysis will frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (internal quotation marks and citations omitted).

**a. Reporting-Time Pay**

Plaintiffs' first claim for reporting-time pay has three elements: (1) employees were required to report for work; (2) employees did report; and (3) employees were not put to work. *See* Cal. Code Regs., tit. 8, § 11010 subd. 5 (2001). "For purposes of class certification, the issue is whether these [elements] may be applied on a classwide basis, generating a classwide answer . . . or whether the determination requires too much individualized analysis." *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478 (N.D. Cal. 2012).

Common questions predominate the issue of whether operators were required to report for work and did report within the meaning of the IWC Wage Order. The record before the Court

indicates a uniform, widespread requirement of 1.5 hour standby periods for operators. All operators on 12-hour shifts were subject to standby, and all in a uniform way: by remaining available for a phone call and able to arrive at the refinery within two hours. Operators could be disciplined for failing to answer a phone call or arrive at the refinery within two hours. Defendant argues that the CBA standby provisions were "guidelines" and that departments could have their own standby policies that would supersede the CBA. However, the current record does not support a finding that any department had its own different standby policy, even if a department could. *See In re AutoZone, Inc., Wage & Hour Emp. Pracs. Litig.*, 289 F.R.D. 526, 533–34 (N.D. Cal. 2012), *aff'd*, 789 F. App'x 9 (9th Cir. 2019) (explaining that courts find predominance where plaintiffs present substantial evidence of a specific, detailed, company-wide policy or practice even if defendant presents some conflicting evidence). To the extent there is genuinely conflicting evidence as to whether Shell had a uniform standby policy, that question is common to the class and susceptible of common proof. *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958–59 (9th Cir. 2009) ("[U]niform corporate policies will often bear heavily on questions of predominance and superiority. . . . Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof.").

Defendant's other arguments in opposition go primarily to the merits, particularly the extent to which *Ward v. Tilly's*, 243 Cal. Rptr. 3d 461 (Cal. Ct. App. 2019), controls this case. (Dkt. No. 101 at 17–24.) Defendant also asserts that the reporting-time pay claim demands that each employee was "at the ready" for each standby period—that is, that the employee was reachable and able to arrive at the refinery within two hours if called—and thus demands individualized proof. But, as the *Ward* court explained, "report[ing] for work within the meaning of the wage order is best understood as presenting oneself *as ordered*." *Ward*, 243 Cal. Rptr. 3d at 475. Thus, whether employees reported for work depends on how Shell ordered them to report—a common question susceptible of common proof. After the trier of fact resolves how Shell ordered employees to report to work, the remaining question of when employees did report during the class period is "a damages question which [does] not defeat predominance." *Castillo v. Bank of*

*Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) ("[T]he rule does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof, so long as one or more common questions predominate."). Finally, Defendant's citation to the order denying class certification in *Ward*, (Dkt. No. 102 at 5–17), is unpersuasive. The *Ward* court apparently found that a class-wide trial was unmanageable because, among other issues, whether the part-time employee class members had been required to work a "call in shift" required individualized proof. Not so here. Plaintiffs have submitted evidence that shows when each class member was assigned a standby shift.

**b. Waiting Time Penalties**

Plaintiffs' second claim alleges that Defendant "willfully" failed to pay the wages "earned and unpaid" within the applicable time period to employees who were discharged or quit. Cal. Lab. Code §§ 201(a), 202(a), 203. This claim derives entirely from the reporting-time pay claim, (*see* Dkt. No. 112 at 16): the crux is that if Plaintiffs should have been paid for their standby time, but were not, then Defendant failed to pay all wages "earned and unpaid" when their employment ended. *See Perez v. Leprino Foods Co.*, 2021 WL 53068, at *13–14, 17 (E.D. Cal. Jan. 6, 2021) (holding that "derivative claims" for waiting time penalties, inaccurate wage statements, and UCL violations satisfy commonality and predominance requirements). The only substantial issue on this claim that may require individualized proof is whether each employee either was discharged or quit within the class period. That is a "damages question" that does not overcome the predominance of the common question of law. *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020).

The proposed sub-class includes all operators who "separated from employment (either by involuntary termination or resignation) . . . at any time from June 4, 2015 through January 31, 2020." (Dkt. No. 90 at 9.) Defendant contends that the class period for this claim can only extend until the date Plaintiffs filed suit, June 4, 2019. While there is authority for the proposition that an individual plaintiff can only recover waiting time penalties for the period between separation from employment and filing a complaint, the application to class actions is less clear. *See Sillah v. Command Int'l Sec. Servs.*, 154 F. Supp. 3d 891, 918 (N.D. Cal. 2015) (holding that individual

plaintiff could not recover because he was fired after filing suit). *Cf. Perez v. Leprino Foods Co.*, 2021 WL 53068, at *13–14 (E.D. Cal. Jan. 6, 2021) (certifying waiting time penalties sub-class for employees who separated "at any time within four years prior to the filing of the original complaint until" the date of certification). In any event, whether section 203 penalties can be recovered by persons who separated from the employer after the lawsuit was filed is a common, predominant question.

Defendant also argues that the named Plaintiffs inadequately represent the sub-class. When Plaintiffs filed suit, only Plaintiff Malcolm Synigal had separated from employment; the others still worked for Shell. (Dkt. No. 18 ¶¶ 10–13.) The record indicates that Plaintiff Synigal had voluntarily retired, (Dkt. No. 90-24 ¶ 3), and Defendants say this suits him to represent only class members who left voluntarily and therefore have rights under Labor Code § 202, not those who were discharged and have rights under § 201.

In any event, at oral argument the parties represented that since Plaintiffs filed suit, *all* operators have separated from employment, either voluntarily or due to the sale of the refinery. Indeed, although Plaintiffs moved for certification of a sub-class, at oral argument they asserted that no sub-class is needed as all class members quit, were terminated, or involuntarily separated through the refinery sale. The operative complaint, however, does not make any allegations regarding the refinery sale. (*See* Dkt. No. 18 ¶¶ 13, 26, 39–43.) Accordingly, given that Plaintiffs' oral argument position is somewhat different from their motion and relies on facts not alleged in the complaint, and given that Plaintiffs' present position eliminates Defendant's standing concern since there are named Plaintiffs who were terminated by the refinery sale, Plaintiffs' motion for certification of the waiting time penalties claim is denied without prejudice.

On or before September 13, 2021 Plaintiffs may submit a proposed Second Amended Complaint that amends the waiting time penalties claim (but adds no other claims) along with a five-page brief that addresses why the Court should permit Plaintiffs to amend their complaint and why certification of the waiting time penalties claim is appropriate. Since there is an argument that those who separated from employment after the complaint's filing may not be entitled to waiting time penalties, Plaintiffs should consider sub-classes represented by different named

Plaintiffs. Defendant may submit a five-page brief in response to the request for leave to amend as well as the certification issue on or before September 27, 2021.

**c. Third and Fourth Claims**

The remaining claims for which Plaintiffs seek to certify a class are derivative of the first claim for reporting-time pay. Accordingly, they satisfy predominance as well.

The third claim alleges that Defendant failed to furnish an "accurate itemized statement" showing "wages earned" and "hours worked." Cal. Lab. Code §§ 226, 226.3. Here, (*see* Dkt. No. 112 at 18), the crux is that if standby time constitutes hours worked for which Plaintiffs should have earned wages, then Defendant's wage statements violated the Labor Code by including neither the hours nor the wages. *See Reyna v. WestRock Co.*, 2020 WL 5074390, at *10 (N.D. Cal. Aug. 24, 2020). Given that Defendants admit the wage statements included neither—because Defendant disputes that those were hours worked or wages earned, (Dkt. No. 101 at 29–32)—the Court discerns no substantial issues on this claim other than the issues underlying the reporting-time pay claim.

Plaintiffs' fourth claim alleges that Defendant unlawful conduct under the first, second, and third claims amount to an unlawful business practice that violates California's UCL. Cal. Bus. & Prof. Code §§ 17200 *et seq*. The UCL "borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable . . . and subject to [] distinct remedies." *Gregory v. Albertson's, Inc.*, 128 Cal. Rptr. 2d 389, 392 (Cal. Ct. App. 2002). As such, the UCL claim rises and falls with Plaintiffs' first claim for reporting-time pay and the derivative second and third claims.

Accordingly, because common questions predominate on the reporting-time pay claim, they predominate on the third and fourth claims.

**2. Superiority**

To certify, a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts consider the following factors:

(A) the class members' interests in individually controlling the



United States District Court
Northern District of California

prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.* "[T]hese factors require[] the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks and citation omitted).

Here, a class action will serve to streamline time, effort, and expense. There is no current similar litigation concerning these putative class members. And the predominance of common questions, as explained above, make a class action a more manageable device than individual litigation. At the heart of this case is a single question of law, whether Shell's standby periods constitute "reporting time." *See Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1144 (9th Cir. 2021) (holding superiority requirement met where "the applicability of California law has been adjudicated on a class-wide or subclass-wide basis").

Defendant argues superiority is lacking because Plaintiffs cannot establish that each employee was "at the ready" in a manageable way and because other mechanisms are available, specifically grievances under the CBA or wage claims before the California Labor Commissioner. (Dkt. No. 101 at 24–26.) As explained with regard to predominance, it is not clear as a matter of law that Plaintiffs will need to establish each employee was "at the ready"; if they do, that question will be secondary to the predominant question of whether employees were "required to report" to work. Union grievances are not an alternative mechanism because Plaintiffs allege not that Shell's standby practices violated the CBA, but that the standby practices formalized in the CBA violated the law. Finally, individual adjudications through the California Labor Commissioner are less manageable than a class action because common questions will recur.

Accordingly, the superiority requirement is met.

* * *

The record before the Court establishes that Plaintiffs satisfy the Rule 23(a) and 23(b)(3) requirements to certify a class action, except as to the waiting time penalties claim.

**III. Administrative Motions to File Under Seal**

Plaintiffs seek to file under seal four documents produced by Shell and filed in support of Plaintiffs' motion for class certification. (Dkt. No. 89.) The documents are a list of putative class members; documents from standby-related grievances, with the names of grievants redacted; work schedules indicating standby periods; and Shell's policy on positive discipline. The basis for sealing is that Defendant designated the documents confidential pursuant to the parties' Stipulated Protective Order. (Dkt. No. 29.) However, Plaintiffs dispute the propriety of Defendant's designation and take the position that the documents should be part of the public record. (Dkt. No. 89.) Under this District's Local Rules, where a party seeks to file under seal any material designated as confidential by another party, the submitting party must file a motion for a sealing order. *See* N.D. Cal. Civ. L.R. 79-5(d)-(e). "Within 4 days of the filing of the Administrative Motion to File Under Seal, the Designating Party must file a declaration . . . establishing that all of the designated information is sealable." *Id.* at 79-5(e)(1). "If the Designating Party does not file a responsive declaration as required by subsection 79-5(e)(1) and the Administrative Motion to File Under Seal is denied, the Submitting Party may file the document in the public record no earlier than 4 days, and no later than 10 days, after the motion is denied." *Id.* at 79-5(e)(2). To date, Defendant, the designating party, has not filed a responsive declaration to Plaintiffs' motion to seal. Therefore, the Court DENIES Plaintiffs' motion.

Defendant seeks to file under seal the deposition of Christopher Eric Palacio. (Dkt. No. 100.) The basis for sealing the entirety of the deposition is that Plaintiffs designated it confidential; Defendant does not comment on the propriety of that designation. (Dkt. No. 100-1 at 2.) As to the entirety of the deposition, Plaintiffs are the designating party and have not filed a responsive declaration establishing that the entire deposition is sealable. *See* N.D. Cal. Civ. L.R. 79-5(e). Defendant's basis for sealing excerpts of the deposition is that Mr. Palacio discussed a specific grievance arising from a disciplinary matter, in which the named grievant has a privacy interest. The Court agrees. *See Bickley v. Schneider Nat., Inc.*, 2011 WL 1344195, at *2 (N.D.

Cal. Apr. 8, 2011) ("Federal courts expressly recognize a constitutionally-based right of privacy that can be raised in response to discovery. An employee's personnel records and employment information are protected by the constitutional right to privacy." (citation omitted)); *see also Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178–80 (9th Cir. 2006) (applying "good cause" standard to motions to seal documents attached to non-dispositive motions). Therefore, Defendant's motion is GRANTED in part; the excerpts of Mr. Palacio's deposition at Docket No. 100-1 at 26:19–27:6, 27:22–29:6, 30:16-18, 30:22-23, 31:1-3, 32:8-9, 32:14, 39:14-21, may be filed under seal.

Finally, Plaintiffs request that the Court disregard the portion of Defendant's opposition that exceeds the 25-page limit, *see* N.D. Cal. Civ. L.R. 7-3(a). (Dkt. No. 112 at 7 n.1.) Because the Court grants in part Plaintiffs' motion for class certification, the request is DENIED as moot.

**CONCLUSION**

For the reasons explained above, Plaintiffs' motion for class certification is GRANTED in part. Plaintiffs' claims for (1) reporting time pay, (3) wage statements, and (4) unfair business practices are certified as to the following class:

> All Operators working at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California, *who were scheduled for standby* at any time from June 4, 2015, four years prior to the filing of this complaint, up to and continuing through January 31, 2020.

(emphasis indicates change from proposed class). Plaintiffs may submit a proposed Second Amended Complaint, with a five-page brief addressing why the Court should grant leave to amend and certify the waiting time penalties claim, on or before September 13, 2021. Defendant may submit a five-page brief in response on or before September 27, 2021.

Weinberg, Roger & Rosenfeld A.P.C. and Leonard Carder LLP are appointed as class counsel. The Court will hold a further case management conference on October 28, 2021 at 1:30 p.m. by Zoom video. The parties shall submit an updated joint case management conference statement by October 21, 2021. The Statement shall include a proposed case schedule through trial.

//

This Order disposes of Docket Nos. 89, 90, 100, 102.

**IT IS SO ORDERED.**

Dated: August 30, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California