KRISTINA L. HILLMAN, Bar No. 208599
JANNAH V. MANANSALA, Bar No. 249376
ROBERTA D. PERKINS, Bar No. 153074
CAITLIN GRAY, Bar No. 305118
ALEXANDER S. NAZAROV, Bar No. 304922
MAXIMILLIAN D. CASILLAS, Bar No. 311669
KARA L. GORDON, Bar No. 333379
WEINBERG, ROGER & ROSENFELD
1375 55th Street
Emeryville, CA  94608
Telephone:  (510) 337-1001
Facsimile:   (510) 337-1023
courtnotices@unioncounsel.net
khillman@unioncounsel.net
jmanansala@unioncounsel.net
rperkins@unioncounsel.net
cgray@unioncounsel.net
anazarov@unioncounsel.net
kgordon@unioncounsel.net
mcasillas@unioncounsel.net

AARON KAUFMANN, SBN 148580
DAVID POGREL, SBN 203787
AMANDA EATON,
LEONARD CARDER, LLP
1999 Harrison Street, Suite 2700
Oakland, CA  94612
Telephone: (510) 272-0169
Facsimile:  (510) 272-0174
akaufmann@leonardcarder.com
dpogrel@leonardcarder.com

Attorneys for the Class and Plaintiffs/Class Representatives

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCO DIMERCURIO, CHARLES GAETH, JOHN LANGLITZ, and MALCOLM SYNIGAL on behalf of themselves and others similarly situated,

Plaintiffs,

v.

EQUILON ENTERPRISES LLC dba SHELL OIL PRODUCTS US, and DOES 1 through and including 25,

Defendants.

Case No.  3:19-cv-04029-JSC

[*Assigned for all purposes to the Honorable Jacqueline Scott Corley*]

**DECLARATION OF AARON KAUFMANN IN SUPPORT OF PLAINTIFFS/CLASS REPRESENTATIVES' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION AND PAGA SETTLEMENT**

Date:      October 6, 2022
Time:      9:00 a.m.
Before:   Hon. Jacqueline S. Corley
Courtroom: 8

I, Aaron Kaufmann, declare as follows:

1.     I am an attorney at law, admitted to practice in this Court, licensed to practice law in California, and am a partner at the law firm of Leonard Carder, LLP ("Leonard Carder). My firm has co-counseled with Weinberg, Roger & Rosenfeld in representing the Plaintiffs/Class Representatives and the Class in the above-captioned case ("Action").  I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them.

2.     As the Court has already appointed me and my firm as Class Counsel in this Action, I will not reiterate our qualifications.

3.     I have personally participated in all aspects of this litigation since Class Representatives filed their Motion for Class Certification, including preparing the Motion for Class Certification and the Supplement Motion for Class Certification, preparing the opposition brief to Defendant's Rule 23(f) Petition with the Ninth Circuit seeking permission to appeal the class certification order, discovery, preparing the settlement conference materials (including the damages analysis), attending the settlement conferences, and drafting and negotiating the terms of the Memorandum of Understanding and superseding Class Action Settlement Agreement and Release.

4.     The parties have engaged in extensive discovery in this matter, including completing eight depositions, including one for each of the four Class Representatives. The parties have also exchanged tens of thousands of pages of documents.

5.     The parties participated in settlement conferences with Chief Magistrate Judge Joseph C. Spero on May 26, 2021, November 20, 2021, and June 14, 2022. The Class Representatives attended each of these conferences virtually.

6.     After the third settlement conference with Chief Magistrate Judge Spero, the parties agreed to the major deal points of the settlement on June 14, 2022, including the total settlement of $3.2 million. The parties then negotiated over the terms of a Memorandum of Understanding, which was finally executed on July 30, 2022. The parties also exchanged multiple drafts of a full Class Action Settlement Agreement and Release ("Settlement Agreement"), which was finalized on August 24, 2022. Each of the plaintiffs/class representatives have signed the Settlement Agreement. Defense counsel has represented that they have circulated the Settlement Agreement

for Defendant's signature. The parties will submit a fully-executed Settlement Agreement as soon as Defendant signs it.  Defense counsel consents to submission of the Settlement Agreement with plaintiffs/class representatives' signatures, a true and correct copy which is attached hereto as **Exhibit 1**.

7.    The Settlement Agreement:

    a.    allocates $50,000 for claims under the Private Attorney General Act (PAGA), and per statute, 75 percent of these penalties will be paid to the Labor Workforce Development Agency (LWDA) and the remaining 25 percent will be distributed to class members;

    b.    authorizes Class Counsel to request up to $1,066,666.67 in attorneys' fees, and up to $45,000 in litigation expenses;

    c.    authorizes Class Counsel to request up to $30,000 in class representative service awards;

    d.    allocates $10,000 for settlement administration purposes;

    e.    allocates the remainder, the Net Settlement Fund to resolve claims under the California Labor Code; and

    f.    designates as *cy pres* beneficiary of any residual funds the East Bay Community Law Center, a nonprofit legal services provider that serves low-income residents and communities in housing, consumer, community development, employment matters and other legal matters. Attached hereto as **Exhibit 2** is an excerpt from the organization's 2021 Annual Report describing its main programs.

8.    The Net Settlement is estimated to amount to at least $2,000,000, assuming the maximum possible costs, service awards, and attorneys' fees are awarded.

9.    The Net Settlement is allocated into three shares: 50 percent to be allocated to settle the wage claims, 25 percent to settle claims for interest, and 25 percent for statutory penalties. The settlement will distribute average payments of roughly $6,700 per Class Member, or approximately $84 per standby shift.

10. Class Representatives estimate that, if they prevailed on all potential claims, they could recover:

    a. reporting time pay of approximately $2,854,613, plus approximately $999,115 in pre-judgment interest on that back pay;

    b. waiting time penalties of approximately $3,917,440;

    c. wage statement penalties of approximately $327,100; and

    d. through the PAGA, civil penalties of approximately $449,750 (assuming $100 for each reporting time violation and $250 for each wage statement violation).

11. The Net Settlement Fund of approximately $2,000,0000 contemplated under the terms of the Settlement Agreement represents approximately 70 % of the $2,854,613 in aggregate reporting time pay incurred by the Class. When all wages, interest, and potential penalties are considered, Defendant's total exposure in this action is approximately $8.55 million. The Settlement thus represents approximately 37.4 % recovery on the maximum value of the Action, exclusive of Class Counsel's attorneys' fees and costs. The allocation of $50,000 to PAGA penalties represents over 11 percent of the maximum exposure on that claim.

12. The Net Settlement will be distributed on a pro rata basis to approximately 300 Class Members. Following class certification, 290 Class Members were mailed the Class Notice on June 8, 2022. Only one notice needed to be re-mailed, and after the 60-day notice period, none of the initial 290 Class Members chose to opt out of the Class. Eleven additional Class Members were identified and subsequently mailed the Class Notice on August 9, 2022, with an opt out deadline of October 8, 2022. As of this filing, no additional Class Members have opted out.

13. It is my professional opinion, based on my experience as an employment and wage and hour class action litigator, and based on my own independent investigation and evaluation and consultation with Plaintiffs/Class Representatives, law partners and co-counsel, that the proposed settlement addresses all of the potential claims arising from Defendant's standby policies and practices. I have assessed the risks and inherent delays if we were to continue with the litigation and believe that the Settlement is fair, reasonable, and adequate in light of all known facts and circumstances, including the risk of significant delay, defenses asserted by Defendant, and

uncertainties regarding liability, and the amount of damages, including penalties that are subject to the Court's discretion, that might be recovered.

14.     After a competitive bidding process, CPT Group was appointed to administer the Class Notice.  The parties propose that CPT serve as the Settlement Administrator because it already has Class Member contact information from sending the Class Notice earlier this year. CPT estimates that it will cost approximately $10,000 to administer the settlement.

15.     I have reviewed Leonard Carder's billing records in this case, and as of August 25, 2022, our lodestar amount is approximately $201,269 and our litigation expenses are $821.

16.     My office will submit the settlement agreement to the LWDA as soon as it is fully-executed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of August 2022 at Oakland, California.

_/s/ Aaron D. Kaufmann_
Aaron Kaufmann

# EXHIBIT 1

## CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE

This Class Action Settlement Agreement and Release ("Agreement") is made by and between Plaintiffs MARCO DIMERCURIO, CHARLES GAETH, JOHN LANGLITZ and MALCOLM SYNIGAL ("Plaintiffs" or "Class Representatives"), individually and on behalf of the certified class, the State of California pursuant to the California Private Attorneys General Act, and Defendant EQUILON ENTERPRISES LLC dba SHELL OIL PRODUCTS US ("Defendant" or "Equilon") (collectively the "Parties"), by and through their respective counsel of record. The Parties hereby agree to the following settlement which, if approved by the Court, resolves the pending case *MARCO DIMERCURIO, CHARLES GAETH, JOHN LANGLITZ, and MALCOLM SYNIGAL on behalf of themselves and others similarly situated v. EQUILON ENTERPRISES LLC DBA SHELL OIL PRODUCTS US, and DOES 1 THROUGH AND INCLUDING 25* filed in the United States District Court for the Northern District of California, Case No. 3:19-cv-04029-JSC (the "Lawsuit").

## I.   DEFINITIONS

In addition to other terms defined in this Agreement, the terms below have the following meaning in this Agreement:

A.   "Class" or "Classes" means the class certified by the Court in the Order Re: Class Certification and Supplemental Order Re: Class Certification, which was defined as "All Operators working at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California, who were scheduled for standby at any time from June 4, 2015, four years prior to the filing of this complaint, up to and continuing through January 31, 2020," and that includes the following subclasses:

> **2016 to 2019 Waiting Time Penalties Sub-Class:**  All Class Members who have been employed and separated from employment (either by involuntary termination or resignation) at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California, at any time from June 4, 2016 through June 3, 2019, and who, upon separation from employment, did not timely receive all wages owed as a result of reporting obligations.

> **2019 to 2020 Waiting Time Penalties Sub-Class:**  All Class Members who have been employed and separated from employment (either by involuntary termination or resignation) at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California, at any time from June 4, 2019 through January 31, 2020, and who, upon separation from employment, did not timely receive all wages owed as a result of reporting obligations.

B.   "Class Counsel" means Weinberg, Roger and Rosenfeld A.P.C., and Leonard Carder LLP.

C.   "Class Counsel Fees Payment" and "Class Counsel Litigation Expenses Payment" mean the amounts awarded to Class Counsel by the Court to compensate them for, respectively, their attorneys' fees and litigation expenses incurred in connection with the Lawsuit, including

their pre-filing investigation, their filing of the Lawsuit and all related litigation activities, this Settlement, and all post-Settlement compliance and approval procedures.

D.      "Class Member" is a member of the Class who did not file any valid and timely request to exclude himself, herself, or them self from the Class after the Class Member was mailed notice of the class certification.

E.      "Class Notice" means the Notice of Proposed Settlement of Class Action Lawsuit that is attached hereto as Exhibit A and described in Section III.E.2.a.

F.      "Class Representative Payment" means the special payment made to each Plaintiff in their capacity as Class Representatives to compensate them for initiating the Lawsuit, performing work in support of the Lawsuit, and undertaking the risk of retaliation and potential liability for attorneys' fees and expenses in the event they were unsuccessful in the prosecution of this Lawsuit.

G.      "Individual Settlement Share" means the amount allocated to each Class Member pursuant to this Settlement Agreement.

H.      "Court" means the United States District Court for the Northern District of California.

I.      "Defense Counsel" means Gary Lafayette, Brian Chun and Saisruthi Paspulati of Lafayette & Kumagai, LLP.

J.      "Effective Date" of this Settlement Agreement shall mean after *all* of the following conditions have been satisfied:

Execution of this Settlement Agreement by all Parties, Class Counsel and Defense Counsel;

Submission of this Settlement Agreement to the Court, along with appropriate motions and requests for approval of this Settlement Agreement by the Court;

Preliminary approval of the settlement by the Court;

Mailing of the Notice of Settlement to the Class Members in accordance with the Preliminary Approval Order;

Expiration of the opt-out period as defined in the Notice of Settlement;

A formal fairness hearing, the date of entry of a written final order by the Court approving this Settlement Agreement and entering final judgment with respect to the Class Action. Provided, that in the event there are written objections made prior to the formal fairness hearing, or an appeal of the Court's approval of the settlement taken, then the Effective Date shall be the later of the following events: when the period for filing any appeal, writ or other appellate proceeding opposing the settlement has elapsed without any appeal, writ or other appellate proceeding having been filed; or any appeal, writ or other appellate proceeding

opposing the settlement has been dismissed finally and conclusively with no right to pursue further remedies or relief; or any appeal, writ or other appellate proceeding has upheld the Court's final order with no right to pursue further remedies or relief.

K.      "Final Approval Hearing" means the hearing to be conducted by the Court to determine whether to implement and approve finally the terms of this Agreement.

L.      "Final Approval Order" and "Order of Final Approval" mean an Order that finally and unconditionally grants final approval of this Agreement, enters judgment with respect to the Lawsuit, and authorizes payments to the Settlement Administrator, the Class Members, and Class Counsel as provided in this Agreement.

M.      "Gross Settlement Amount" means the amount of Three Million Two Hundred Thousand Dollars ($3,200,000), which is the total and maximum amount Defendant will be required to pay under this Settlement Agreement, plus any interest that has accrued pursuant to Section III.B.2.  Nothing in this provision alters the obligations of Defendant to pay employer payroll taxes as noted below in Section III.B.1.  This amount is non-reversionary and must be paid in full pursuant to the terms of this Agreement if approved by the Court.

N.      "Judgment" means the Order of Final Judgment entered by the Court. The Parties will draft and submit a proposed Judgment to the Court along with the Motion for Final Approval.

O.      "MOU" means the Memorandum of Understanding of the terms of the Settlement entered into by the Parties on July 19, 2022.

P.      "Net Settlement Amount" means the Gross Settlement Amount less (i) the Class Representative Payments, as described herein and approved by the Court; (ii) the Class Counsel Fees Payment and the Class Counsel Litigation Expenses Payment, as described herein and approved by the Court; (iii) the PAGA Allocation, as described herein and approved by the Court; and (iv) the Settlement Administrator's reasonable fees and expenses, as described herein and approved by the Court.

Q.      "PAGA Allocation" means the amount allocated to settle all claims under the Labor Code Private Attorneys General Act of 2004, California Labor Code § 2698, et seq. ("PAGA") in this Lawsuit.

R.      "Preliminary Approval of the Settlement" means the Court's preliminary approval of the Settlement.

S.      "Released Parties" means Defendant, including each of their past and present successors, subsidiaries, parents, holding companies, affiliated companies and divisions and other related entities, as well as the successors, predecessors, shareholders, subsidiaries, investors, parent, sister and affiliated companies, officers, directors, partners, assigns, agents, employees, principals, heirs, administrators, attorneys, vendors, accountants, auditors, consultants, fiduciaries, insurers, reinsurers, employee benefit plans, and representatives of each of them, both individually and in their official capacities, past or present, as well as all persons

3

acting by, through, under or in concert with any of these persons or entities, and persons acting by, through, under or in concert with any of these persons or entities.

T. "Settlement" means the disposition of the Lawsuit and all related claims effectuated by this Agreement.

U. "Settlement Administrator" means the administrator proposed by the Parties and appointed by the Court to provide notice of this proposed class action settlement to the Class and to perform other related functions to administer the Settlement as described herein. CPT Group, Inc. ("CPT") administered the notice at class certification of this matter and is selected by the Parties as the Settlement Administrator, unless CPT rejects that appointment or the Parties later agree on a different Settlement Administrator.

V. "Settlement Class Period" means the period of time from June 4, 2015 through January 31, 2020.

W. "Settlement Share" means each Class Member's share of the Net Settlement Amount as provided by this Agreement.

## II.   RECITALS

A. Plaintiffs filed a class action complaint, *MARCO DIMERCURIO, CHARLES GAETH, JOHN LANGLITZ, and MALCOLM SYNIGAL on behalf of themselves and others similarly v. EQUILON ENTERPRISES LLC DBA SHELL OIL PRODUCTS US, and DOES 1 THROUGH AND INCLUDING 25* in the Superior Court for the County of Contra Costa on June 4, 2019. The complaint was removed to the United States District Court for the Northern District of California, Case No. 3:19-cv-04029-JSC on July 12, 2019.

B. Plaintiffs provided notice to the Labor and Workforce Development Agency ("LWDA") of certain claims against Defendant on June 14, 2019.

C. The Class was certified on August 30, 2021, and the Waiting Time Penalty Subclasses were certified on January 27, 2022.

D. The Class was sent notice of class certification on June 8, 2022, which provided an opportunity for Class Members to exclude themselves at that time.

E. The Parties participated in mediations and settlement conferences as follows: The Parties participated in settlement conferences with Judge Joseph Spero, Northern District of California on May 26, 2021, November 10, 2021, and June 14, 2022.

F. Class Counsel has conducted a thorough investigation into the facts of the Lawsuit. Based on the discovery conducted and their own independent investigation, analysis and evaluation, Class Counsel and the Class Representatives are of the opinion that the Settlement is fair, adequate and reasonable and is in the best interest of the Class in light of all known facts and circumstances, including the risk of significant delay, defenses asserted by Defendant, and potential additional appellate issues. In particular, Plaintiffs believe that this Settlement is the best possible solution for the Class.

G.      In connection with the Lawsuit, Defendant provided information and produced documents, including scheduling and standby shift records for Class Members during the Class Period. Class Counsel engaged in extensive review and analysis of the responses and records. The Parties took depositions of at least eight individuals, including Plaintiffs, refinery supervisors, and individuals designated as Persons Most Knowledgeable on specified issues.

H.      It is the mutual desire of the Parties to fully, finally, and forever settle, compromise, release, resolve, and discharge all disputes and claims raised in or related in any way to the Lawsuit. In order to achieve a full and complete release of the released persons, the Class, including Plaintiffs and each Class Member, acknowledge that this Settlement is intended to include and resolve all claims arising from, related to, or could have been brought based on the allegations in the Lawsuit as more fully set forth in Section III.F of this Agreement.

I.      This Agreement represents a compromise and settlement of highly disputed claims. Nothing in this Agreement is intended or will be construed as an admission by Defendant that the claims in the Lawsuit have merit or that Defendant bears any liability to Plaintiffs or the Class on those claims or any other claims. Nothing herein shall constitute an admission by Defendant that the Class Action was properly brought as a class or representative action other than for settlement purposes. Defendant denies each and all of the claims alleged by Plaintiffs in the Lawsuit. To the contrary, Defendant denies and continue to deny each and every material factual, procedural, and/or legal allegation and alleged claim asserted in the Class Action. Nevertheless, Defendant has taken into account the uncertainty and risks inherent in any litigation and have also concluded that further defense of the Lawsuit would be protracted and expensive. Defendant, therefore, has determined that it is desirable and beneficial that the Lawsuit be settled in the manner and upon the terms and conditions set forth in this Agreement.

J.      Nothing in this Agreement is intended or will be construed as an admission by Plaintiffs that the Defendant's defenses or allegations have merit or that Defendant is not liable to Plaintiffs or the Class as alleged by Plaintiffs. Plaintiffs deny each and all of the claims and defenses alleged by Defendant in its answer or otherwise in this Lawsuit. Nevertheless, Plaintiffs have taken into account the uncertainty and risks inherent in any litigation and have also concluded that further litigation of the Lawsuit would be protracted and expensive. Plaintiffs, therefore, have determined that it is desirable and beneficial that the Lawsuit be settled in the manner and upon the terms and conditions set forth in this Agreement.

Based on these recitals, the Parties agree as follows:

## III.    SETTLEMENT TERMS AND CONDITIONS

A.      **Gross Settlement Amount.** Subject to the terms and conditions herein, and in consideration for settlement of the Lawsuit and the release of claims of the Class, Defendant agrees to pay the Gross Settlement Amount as defined in Section I.M. above.  Any Class Representative Payment, Class Counsel Fees Payment and Class Counsel Litigation Expenses Payment, PAGA Allocation (including PAGA Payments), Settlement Shares, and the Settlement Administrator's reasonable fees and expenses in administering the Settlement shall be deducted from the Gross Settlement Amount.  The entire Gross Settlement Amount will be disbursed pursuant to this Agreement, and none of it will revert to Defendant.  The Gross Settlement

Amount shall be paid into an appropriate interest maximizing, Qualified Settlement Fund ("QSF") created by the Settlement Administrator in accordance with the timing set forth in Section III.B.2 herein. The Settlement Administrator shall handle such monies pursuant to the terms of this Agreement.

B.   **Payments from the Gross Settlement Amount.** The Settlement Administrator will make the following payments out of the Gross Settlement Amount as follows:

1.   **Maximum Amount Paid.** The Gross Settlement Amount is the total amount that Defendant is are obligated to pay for any and all purposes under this Agreement, except that Defendant will be required to pay the employer's share of any payroll taxes incurred as a result of this Settlement, in addition to the Gross Settlement Amount.

2.   **Timing of Payments.** Defendant shall pay the Gross Settlement Amount into the QSF within thirty (30) calendar days of the Effective Date of the Settlement if Defendant has not already paid the Gross Settlement Amount into the QSF in accordance with Section III.B.2.a.  If the Gross Settlement Amount is not timely paid, under either III.B.2 or III.B.2.a, whichever is applicable, into the QSF created by the Settlement Administrator, the Gross Settlement Amount will begin to incur interest at the statutory rate for a judgment for wages under California law.

a. **Funding of Settlement in the Event of Appeal.** In the event of any appeal, Defendant shall pay the Gross Settlement Amount into the QSF within thirty (30) calendar days of the filing of a notice of appeal from the Final Approval Order.  Any accrued interest from the QSF during the pendency of the appeal will be distributed as follows:  (a) in an amount equal to the original PAGA Allocation divided by $3.2 million and then multiplied by the accrued interest with the result then added to the PAGA Allocation, and distributed in accordance with Section III.C.3, (b) in an amount equal to the original, Court-approved Class Counsel Fees Payment divided by $3.2 million and then multiplied by the accrued interest with the result then added to the Class Counsel Fees Payment, (c) in an amount equal to the original, Court-approved Class Counsel Litigation Expenses Payment divided by $3.2 million and then multiplied by the accrued interest with the result then added to the Class Counsel Litigation Expenses Payment, (d) in an amount equal to the original, Court-approved Class Representative Payment divided by $3.2 million and then multiplied by the accrued interest with the result then added to each Class Representative Payment, and (e) all remaining accrued interest added to the Net Settlement Amount and distributed in accordance with Section III.D. No payments or distributions shall be made from the QSF during the pendency of any appeal. In the event any appeal results in dissolution, cancellation or voiding of this Settlement, Defendant shall be entitled to the return of all funds in the QSF (including all accrued interest). Once Defendant pays the Gross Settlement Amount into the QSF, Defendant will have fulfilled its monetary obligations under the terms of this Settlement, other than the employer's share of any payroll taxes. Nothing in this Section is intended to contradict or overrule Section III.B.1, which the Parties expressly intend to be bound by even in the event of an appeal.

C.   **Payments from the Gross Settlement Amount.** The Settlement Administrator will make the following payments out of the Gross Settlement Amount subject to timing as directed by counsel for the Parties and/or the Court:

1.      **To Class Representatives**:  In addition to the amounts determined to be due to Plaintiffs as Class Members under this Settlement Agreement, the Class Representatives/Plaintiffs will apply to the Court for Class Representative Payments, to be paid out of the Gross Settlement Amount.  Plaintiffs intend to request to Seven Thousand Five Hundred Dollars ($7,500) per Class Representative as the Class Representative Payment. The Settlement Administrator will pay the Class Representative Payment approved by the Court out of the Gross Settlement Amount. If the Court approves a Class Representative Payment of less than Seven Thousand Five Hundred Dollars ($7,500) for each Plaintiff, the remainder of the unapproved amount will be part of the Net Settlement Amount in accordance with the calculation explained in Section III.D.  Payroll tax withholding and deductions will not be taken from the Class Representative Payment and instead an IRS Form 1099 will be issued to each Plaintiff by the Settlement Administrator reflecting the Class Representative Payment.

2.      **To Class Counsel**:  Class Counsel will apply to the Court for an award of not more than thirty three and one third percent (33-1/3%) of the Gross Settlement Amount as their Class Counsel Fees Payment, or One Million Sixty Six Thousand Six Hundred and Sixty Six Dollars and Sixty Seven Cents ($1,066,666.67) in addition to litigation expenses up to $45,000, including expert fees, litigation costs, travel expenses, copy costs, electronic discovery services, consultants, space and technology rentals, and other normal expenses incurred, as their Class Counsel Litigation Expenses Payment. The ultimate amount of any award for Class Counsel Fees Payment and Class Counsel Litigation Expenses Payment is to be determined by the Court, and Class Counsel will submit an application for fees, costs, and expenses to the Court for approval prior to the date of the Final Approval Hearing. The Settlement Administrator will pay the amount approved by the Court out of the Gross Settlement Amount. Class Counsel will inform the Settlement Administrator how to distribute the Class Counsel Fees Payment and Class Counsel Litigation Expenses Payment between Class Counsel's offices. If the Court approves a Class Counsel Fees Payment of less than 33-1/3%, or a Class Counsel Litigation Expenses Payment less than requested, the remainder of the unapproved amount will be part of the Net Settlement Amount in accordance with the calculation explained in Section III.D.  Payroll tax withholding and deductions will not be taken from the Class Counsel Fees Payment and Class Counsel Litigation Expenses Payment and instead one or more IRS Form 1099 will be issued by the Settlement Administrator to Class Counsel with respect to those payments.

a.      The Parties agree that, over and above the total amount of the Court-approved award for the Class Counsel Fees Payment and the Class Counsel Litigation Expenses Payment, each of the Parties, including all persons eligible to be Class Members, shall each bear their own fees and costs incurred by them relative to the investigation, filing, prosecution or settlement of the Class Action, the negotiation, execution, or implementation of this Settlement Agreement, and/or the process of obtaining, administering or challenging a Preliminary Approval Order and/or Final Approval Order.

b.      The Parties agree that Class Counsel shall be solely responsible for the division and distribution of any and all Court-approved Attorneys' Fees and Costs awarded in the Class Action to Class Counsel. Class Counsel agree to release Defendant and the Released Parties from any responsibility for or liability arising out of or related to the division and distribution of any court-approved Attorneys' Fees and Costs to Class Counsel.

c.       Any order, finding, ruling, holding, or proceeding relating to any such applications for an award for the Class Counsel Fees Payment and the Class Counsel Litigation Expenses Payment shall not operate to terminate or cancel this Agreement or otherwise affect or delay the finality of the final order and judgment or this Settlement.

d.       If Class Counsel appeal the Court's ruling on their request for Attorneys' Fees and Costs, any ruling of any appellate court in such an appeal (regardless of its substance) shall not constitute a material alteration of this Settlement Agreement, and shall not give Plaintiffs, Class Counsel, or the Participating Class Members the right to modify, revoke, cancel, terminate, or void this Settlement Agreement.

e.       All claims for attorneys' fees and costs that Class Counsel and Plaintiffs may possess against Defendant, or Defendant against Plaintiffs or Class Counsel, arising from this litigation have been compromised and resolved by this Agreement and shall not be affected by any appeal that Class Counsel may file.

3.       **PAGA Allocation.** The Parties will request approval from the Court of an allocation of Fifty Thousand Dollars ($50,000) in settlement of the PAGA Released Claims as the PAGA Allocation.

a.       To the Labor and Workforce Development Agency. Seventy-five percent (75%) of the PAGA Allocation will be paid to the LWDA. Twenty-five percent (25%) of the PAGA Allocation will be paid to the Class Members as a portion of the Net Settlement Fund and in the same manner as the Individual Settlement Shares described in Section III.D.

4.       **To the Settlement Administrator.** The Parties agree to pay the Settlement Administrator chosen by Class Counsel and approved by Defendant for its reasonable fees and expenses related to administering this Settlement, including, but not limited to, printing, distributing, and tracking forms for this Settlement, calculating estimated amounts per Class Member, tax reporting, distributing all payments from the Gross Settlement Amount (as adjusted), and providing necessary reports and declarations, and other duties and responsibilities set forth herein to process this Settlement, as requested by the Parties. The amount paid to the Settlement Administrator for its reasonable fees and expenses will be paid out of the Gross Settlement Amount. Every effort will be undertaken to minimize this cost and the Settlement Administrator will ensure proper notice and administration of the fund.  In the event that the Court does not grant final approval of the settlement, or if the settlement is voided for any other reason, the Parties shall share the costs of any administration costs incurred, with each side paying fifty percent (50%) of any administration fees incurred to date.

D.       **Settlement Share.**  The Settlement Administrator will pay, within thirty-five (35) calendar days of the Effective Date, a Settlement Share from the Net Settlement Amount to each Class Member.

1.       **Calculation.**  After deducting the Class Representative Payment, Class Counsel Fees Payment and Class Counsel Litigation Expenses Payment, payments to the LWDA, and the Settlement Administrator's fees and expenses from the Gross Settlement Amount, each Class Member shall receive a share of the Net Settlement Amount, calculated as follows:

8

The Settlement Administrator will calculate Individual Settlement Shares for Class Members based on the number of each Class Member's standby shifts that were not activated for work ("Standby Shifts"), as reflected on Defendant's internal records. The Settlement Administrator shall calculate each Class Member's potential share of the Net Settlement Fund (i.e., the Class Member's Individual Settlement Amount) by calculating the Standby Shifts worked by the Class Member during the Class Period.  The Individual Settlement Share allocation for each Class Member shall then be determined by dividing the total number of Standby Shifts (for all Settlement Class Members, aggregated) into the amount of the Net Settlement Fund to arrive at a Per-Shift Settlement Amount.  The Individual Settlement Share for each Eligible Settlement Class Member shall be calculated by multiplying the Class Member's Standby Shifts by the Per-Shift Settlement Share.  The value of an Individual Settlement Share attributable to any Settlement Class Member who opts out shall be allocated and distributed to all Eligible Settlement Class Members (who did not opt out), on a pro rata basis.

Each Notice mailed to a Class Member will identify the number of compensable Standby Shifts that Defendant's records indicate the individual worked as a Class Member during the Class Period and estimate each Class Member's pro rata share of the Net Settlement Fund.   The Notice shall also include instruction for any Class Member who may want to dispute the information used to calculate his or her settlement share.

2.      **Settlement Payment Allocation.**  All Settlement Shares will be allocated as follows: 50% to settlement of wage claims, 25% to settlement of claims for interest and 25% statutory penalties. The portion allocated to settlement of wage shall be subject to all applicable withholdings and reported on an IRS Form W-2 by the Settlement Administrator and the portion allocated to interest and penalties shall be reported on an IRS Form 1099 by the Settlement Administrator. After appropriate tax withholding from each Class Member's Settlement Share, the net payment to be received by each Class Member as required by law via an IRS Form W-2, the Settlement Administrator will pay all such withheld funds to the appropriate state and federal taxing authorities. The Settlement Administrator shall provide each Class Member with appropriate documentation setting forth the amount of any tax or other deductions in accordance with state and federal tax requirements. The Parties agree that this allocation of Settlement Shares to wages, interest, and statutory penalties is consistent with the substance of the Lawsuit.

3.      **Tax Obligations.**

a.      **Employers' Responsibility for Taxes.** As to the portion of Class Members' settlement proceeds that constitute wages, Defendant will be separately responsible for its share of any employer payroll or other taxes, including the employer FICA, FUTA, and SDI contributions, which shall not be paid from the Gross Settlement Amount. There shall be no reversion of the Gross Settlement Amount to pay for Defendant's tax liabilities.

b.      **Parties' and Class Members' Responsibility for Taxes.** Each Party and Class Member will be solely responsible for their own tax obligations. The Parties agree and understand that neither Party has made any representations regarding the tax obligations or consequences, if any, related to this Settlement. The Parties agree that Defendant, each Plaintiff, and each Class Member are solely responsible for determining the tax consequences of payments made pursuant to this Agreement and for paying taxes, if any, which are determined to be owed

by each of them or on such payments (including withholdings, penalties and interest related thereto) by any taxing authority, whether state, local, federal, or foreign taxing authority. Defendant will not be responsible for any Class Member's taxes or treatment of the tax consequences (including withholdings, penalties and interest related thereto).

c.   **Employer's Share of Payroll Taxes.** The Settlement Administrator will give Defendant an estimate of the employer's share of payroll taxes within five (5) calendar days of sending out the Class Notice. Upon calculation of each Class Member's Individual Settlement Share, and within three (3) calendar days after the Final Approval Order (if not sooner), the Settlement Administrator shall advise Defendant of the amount of the employer's share of payroll taxes. Defendant will provide the estimated amount of the employer's share of payroll taxes to the Settlement Administrator at the same time that Defendant provides the Gross Settlement Amount. To the extent there are any excess funds from the Settlement Administrator's estimate of the employer's share of taxes that ultimately are not needed to pay such taxes, those funds shall be returned to Defendant. Such return shall not be made until after complete distribution of the Gross Settlement Amount and all final tax reporting thereon.

4.   **No Reversion.**  Participating Class Members are entitled to 100% of the Net Settlement Amount. Defendant maintains no reversionary right to any portion of the Net Settlement Amount.

E.   **Procedure for Approving Settlement**.  The Parties agree to the following schedule and procedures for obtaining the Court's approval of the Settlement, notifying the Class, providing a copy of the Agreement to the LWDA and processing all benefits provided under this Settlement Agreement:

1.   **Motion for Preliminary Approval of Settlement by the Court**.  Plaintiffs will move the Court for (collectively, "Motion for Preliminary Approval"):

a.   Preliminary approval of the terms of this Agreement.

b.   Approval of the Class Notice, settlement procedure, and appointment of the Settlement Administrator.

c.   Scheduling of a Final Approval Hearing on the question of whether the terms of this Agreement should be finally approved as fair, adequate and reasonable as to Plaintiffs and the Class Members.

2.   **Notice to Class Members**.  If the Court enters an Order granting Preliminary Approval of the Settlement, every Class Member, who Defendant maintained an address for, will be provided with the Class Notice in the form attached here as Exhibit A, or as ordered modified by the Court's Order granting Preliminary Approval (if any).

a.   **Settlement Administrator.** The Parties agree that the Settlement Administrator shall have the authority to establish and maintain a QSF; confirm Class Member addresses; mail the Class Notice; respond to Class Member inquiries; send reminder notices to Class Members; process objections; process opt out requests; process challenges to Individual Settlement Shares; calculate the employee and employer's share of taxes; take appropriate withholding from

10

Individual Settlement Shares and remitting all required payments to the proper authorities; issue copies of any applicable tax documents; report payment of the Gross Settlement Amount to all required taxing and other authorities; and disburse sums from the QSF subject to Court Order.

b.      **Objections.**  To object to the Settlement, a Class Member must provide a written objection (along with any supporting documents) to the Settlement Administrator, not later than forty-five (45) calendar days after the Class Notice is mailed. The date of the postmark or email to the Settlement Administrator shall be the exclusive means for determining that an objection was timely submitted. The written objection must set forth the name and address of the individual objecting, and in clear and concise terms, state the arguments supporting the objection. Defendant shall not be responsible for the fees, costs or expenses incurred by Class Counsel or Class Members arising from or related to any objections by Class Members or otherwise purport to object to this Agreement or related to any appeals thereof. Defendant will not take any steps to discourage any current or former employees from participating or encourage any current or former employee to appeal or object to the Settlement.

d.      **Opt Out.**  Each Class Member will have the opportunity to opt out of the Settlement pursuant to Federal Rule of Civil Procedure, Rule 26(e)(4). To opt out of the Settlement, a Class Member must provide a written request to be excluded to the Settlement Administrator not later than forty-five (45) calendar days after the Class Notice is mailed. The date of the postmark or email to the Settlement Administrator shall be the exclusive means for determining that an opt out request was timely submitted. The opt out request must contain: (1) the full name, address, and telephone number of the person opting out; (2) the phrase "Request for Exclusion" or "Opt-Out" at, or near, the top of the document; and (3) a statement that makes clear the Class Member wants to opt-out and understanding s/he will not receive any benefit under the Settlement.

The opt-out request must be personally signed by the Class Member who seeks to opt-out.  No Class Member may opt out by having a request to opt-out submitted by an actual or purported agent or attorney acting on behalf of the Class Member.  Each Class Member who does not submit a request for exclusion substantially in compliance with this section and as provided for in the Class Notice within the deadline set by the Court shall be deemed to participate in the Settlement, be bound by all releases provided in this Settlement Agreement, and shall be issued their portion of the Settlement Share.

If the number of Class Members who opt-out of the settlement exceeds five percent (5%) (for example at least 15 of the estimated 290 Class Members), Defendant at its sole discretion may void the settlement.

e.      **Provision of Class Member Names and Data to Settlement Administrator.** Within ten (10) business days of Preliminary Approval of the Settlement, Defendant shall provide the Settlement Administrator with the, Social Security Number for each Class Member, in addition to and the number of each Class Member's Standby Shifts during the Class Period, in a readable Microsoft Office Excel spreadsheet.  The Settlement Administrator will use this information to the names and contact information it utilized for the notice process following class certification, as previously provided under section II.D, and as updated by any address changes or updates obtain in that process. This information is collectively referred to as "Class

List and Data." Further, for the Class Members, both the Defendant's HR database and the information gathered during class notice, as previously provided under section II.D, shall be used to determine the most accurate contact information. The Settlement Administrator will then have an opportunity to review the data provided and to calculate each Class Member's estimated Settlement Share. Class Counsel shall have the opportunity to review the calculation of each Class Member's estimated Settlement Share prior to mailing. For the Class Members, the Class List and Data shall also be provided to Class Counsel except Class Counsel will not be provided the Social Security Numbers for any Class Member. The Class List and Data will remain confidential and will not be disclosed to any outside party, except as required to applicable tax authorities, or with the express written consent of Defendant, or by order of the Court.

f. **Mailing of Notice.** Within fifteen (15) calendar days after receipt of the Class List and Data, the Settlement Administrator shall mail the Class Notice to Class Members via first-class regular U.S. Mail.

g. **Class List and Data Confirmation Checks.** If a new address is obtained by a way of a returned Class Notice, then the Settlement Administrator shall promptly forward the original Class Notice to the updated address via first-class regular U.S. Mail indicating on the original Class Notice the date of such remailing. Where a Class Notice is returned as undeliverable, without a forwarding address, the Settlement Administrator will perform a computer/SSN and "skip trace" search to obtain an updated address, and shall then perform a re-mailing, if another mailing address is identified by the Settlement Administrator. If no current address is located, the Class Notice for that individual will be deemed undeliverable. The Parties agree to take reasonable steps to cooperate with the Settlement Administrator to locate a more recent address for Class Members, where necessary. If the procedures herein are followed, Defendant, Class Counsel and the Settlement Administrator shall be deemed to have satisfied their obligation to provide the Class Notice to the Class.

h. **Expiration of Settlement Checks.** Any checks issued by the Settlement Administrator to Class Members shall be negotiable for one hundred and twenty (120) calendar days from issuance. In the event a settlement check payable to a Class Member expires, that individual shall have the right to submit a request to the Settlement Administrator for reissuance of the check if funds remain available.

i. **Declaration of Due Diligence.** Seven (7) calendar days before Plaintiffs' moving papers are due for the Final Approval Hearing, the Settlement Administrator shall prepare a declaration of due diligence and proof of mailing with regard to the mailing of the Class Notice, and any attempts by the Settlement Administrator to locate the members of the Class ("Due Diligence Declaration"), to Class Counsel and Defense Counsel for presentation to the Court. The Settlement Administrator will attach to the Due Diligence Declaration a report showing the name of each individual. Class Counsel shall be responsible for filing the Due Diligence Declaration with the Court.

3. **Waiver of Right to Appeal.** Provided that the Judgment is consistent with the terms and conditions of this Agreement, Plaintiffs, Class Members, and Defendant, and its respective counsel hereby waive any and all rights to appeal from the Judgment, including all rights to any post-judgment proceeding and appellate proceeding, such as, but not limited to, a

motion to vacate judgment, a motion for new trial, a motion for relief and any extraordinary writ, and the Judgment therefore will become non-appealable at the time it is entered. The waiver of appeal does not include any waiver of the right to oppose any appeal, appellate proceedings or post-judgment proceedings. This paragraph does not preclude Plaintiffs or Class Counsel from appealing from a refusal by the Court to award the full Class Representative Payment, the Class Counsel Fees Payment, or the Class Counsel Litigation Expenses Payment sought by them.

4.    **Distributions.** The occurrence of the Effective Date is a prerequisite to any distributions from the Gross Settlement Amount. If all conditions necessary for the Effective Date have been satisfied, the Settlement Administrator will release the total amount of payments due to Plaintiffs, the LWDA, Class Counsel, and Class Members within forty-five (45) calendar days of the Effective Date.

5.    **Uncashed or Returned Settlement Checks.** The Settlement Administrator will provide notice to Class Counsel and Defense Counsel of any settlement checks returned as undeliverable and any settlement checks remaining uncashed for more than one hundred and twenty (120) calendar days after issuance (the "Initial Cash Check Deadline"). Sixty (60) calendar days prior to Initial Cash Check Deadline, the Settlement Administrator will send a notice reminding Class Members who have settlement checks remaining uncashed to cash the checks. The Settlement Administrator will provide notice to Class Counsel and Defense Counsel of any settlement checks returned as undeliverable and any settlement checks remaining uncashed after the Initial Cash Check Deadline. After the reminder notice has been mailed to Class Members with uncashed checks, and in the event any funds represented by uncashed checks ("uncashed check fund") amount to more than $25,000 after the Initial Cash Check Deadline, the uncashed funds will be redistributed. The cost of redistribution shall be deducted from the uncashed check fund and will not result in additional costs. Any remaining uncashed funds shall be redistributed equally among the Class Members who negotiated the initial settlement checks.  If any funds are to be redistributed, Class Members will have one hundred and twenty (120) calendar days to cash the checks, after which the Settlement Administrator will provide notice to Class Counsel and Defense Counsel of any settlement checks remaining uncashed. Any funds represented by these uncashed settlement check(s) will be distributed to cy *pres* beneficiary East Bay Community Law Center (Berkeley, CA).  In the event the uncashed check fund is less than $25,000, the *cy pres* beneficiary shall receive all of the uncashed check fund and there will not be a redistribution to Class Members.

6.    **Notice of Settlement to the LWDA**. Class Counsel will submit this Agreement, which sets forth the terms of this Settlement, to the LWDA pursuant to California Labor Code section 2699(l)(2).

7.    **Final Report by Settlement Administrator to Court.** Within ten (10) calendar days after final disbursement of all funds from the Gross Settlement Amount, the Settlement Administrator will serve on the Parties and Class Counsel shall forthwith file with the Court a declaration proving a final report on the disbursements of all funds from the Gross Settlement Amount.

F.    **Release of Claims**

1.     **Plaintiffs General Release.**  In consideration of their awarded Class Representative Payments, their respective pieces of the Settlement Shares, and the other terms and conditions of the Settlement, each Plaintiff (who shall not opt out), jointly, severally, shall, and hereby fully and generally releases, discharges, and covenants not to sue the Released with respect to any and all claims, judgments, liens, losses, debts, liabilities, demands, contracts, disputed wages, obligations, guarantees, penalties, costs, expenses, attorneys' fees, damages, indemnities, actions, causes of action, and obligations of every kind and nature in law, equity or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, contingent or accrued, occurring up to the execution of this Settlement, which the Plaintiffs now owns or holds or has at any time heretofore owned or held, arising out of or in any way connected with the Plaintiffs' employment, separation of employment, or any other relationship with, any Defendant or Released Party, or any other transactions, occurrences, acts or omissions or any loss, damage or injury whatever, known or unknown, suspected or unsuspected, resulting from any act or omission by or on the part of said Defendant or Released Party, committed or omitted prior to the date of the Preliminary Approval Order.  The Parties intend the Plaintiffs' General Releases to be general and comprehensive in nature, and to release all Plaintiffs' Claims and potential Plaintiffs' Claims against Defendant and the Released Parties to the maximum extent permitted at law. Each Plaintiffs' General Releases include specifically, by way of description, but not by way of limitation, any and all claims arising out of or in any way related to: (i) any interactions between the Plaintiff and any Defendant or Released Party; (ii) Plaintiff's employment, separation of employment, contractual, and/or quasi-contractual relationship with the Defendant and the Released Parties, or any of them; (iii) any allegations as to disputed wages, remuneration, and/or other compensation, due by operation of statute, ordinance, contract, or quasi-contract; (iv) any federal, state, or local law prohibiting discrimination or retaliation on the basis of age, race, color, ancestry, religion, disability, sex, national origin, or citizenship or any other protected category, including, without limitation, claims under Title VII, the California Fair Employment and Housing Act, the California Labor Code, FLSA, the California IWC Orders, the Employee Retirement Income Security Act, and the Americans With Disabilities Act or any other similar statutes whatever the city, county, state, or country of enactment; (v) any claims under the Family and Medical Leave Act of 1993 and/or the California Family Rights Act; and (vi) any transactions, occurrences, acts, statements, disclosures, or omissions, occurring prior to the date of the Preliminary Approval Order.

a.     **Release Under California Civil Code Section 1542**. Plaintiffs hereby agree that, notwithstanding section 1542 of the California Civil Code, all claims that Plaintiffs may have, known or unknown, suspected or unsuspected are hereby released. Section 1542 provides:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

Plaintiffs expressly waive the provisions of section 1542 of the California Civil Code with full knowledge and with the specific intent to release all known or unknown, suspected or unsuspected claims.  Each Plaintiff understands that, if any of the facts relating in any manner to the Class Action, or to the release and dismissal of claims as provided in this Settlement Agreement, are hereafter found to be other than or different from the facts now believed to be

true, he has expressly accepted and assumed that risk and agrees that this Settlement Agreement and the release of claims contained herein shall nevertheless remain effective.  Each Named Plaintiff desires and intends, or is deemed to desire and intend, that this Settlement Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected claims, if any, as well as those relating to the claims referred to above.

b.      Nothing herein precludes the Plaintiffs from pursuing the claims asserted in *DiMercurio, et al. v. Martinez Refining Co., LLC*, Contra Costa Superior Court, Case No. MSC20-01257, for events taking place after January 31, 2020.

2.      **Released Class Claims.**  In consideration of their Settlement Share and other terms and conditions of this Agreement, each Class Member shall, upon the Effective Date, be deemed to have released, on behalf of their respective heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors in interest and assigns, any and all claims against the Released Parties that were alleged in the complaint brought in this Lawsuit and  all claims that could have been brought based on the allegations in the operative Complaint, related to payment of wages, penalties, interest, fees, costs, and all other claims and allegations made in the operative Complaint, from June 4, 2015 through January 31, 2020 (the "**Released Class Claims**"). This release shall not be limited in any way by the possibility that Plaintiffs or Class Members may discover new legal theories or legal arguments not alleged in the operative pleadings in the Lawsuit but which might serve as an alternative basis for pursuing the Released Class Claims. The Released Class Claims are those that accrued during the Settlement Class Period.

a.      Release Binding on Class Members. The Parties intend that this Agreement, including the Released Class Claims as set forth in this Section III.F.2, shall be binding on all Class Members, whether or not they actually receive a payment pursuant to this Agreement. This Agreement shall constitute, and may be pleaded as, a complete and total defense to any Released Class Claims if raised in the future.

b.      The Parties agree that, for any claim that is not alleged in the Complaint, the First Amended Complaint, the Second Amended Complaint, and the Third Amended Complaint, the statute of limitations has and will continue to run on those claims, and no such claims will relate back to the filing of any of the pleadings in this Class Action.

3.      **Released PAGA Claims**. Upon the Effective Date, any and all PAGA claims arising out of the dispute which is the subject of the Class Action or which could have been asserted in the Class Action based on the facts alleged, whether in violation of any state or federal statute, rule or regulation, arising out of, concerning or in connection with any act or omission alleged in the Class Action by or on the part of Released Parties will be finally and fully released, resolved, discharged, and settled with prejudice as to Defendant, subject to the terms and conditions of this Settlement Agreement (collectively "**PAGA Released Claims**").

G.      **No Effect on Other Benefits**. The Settlement Shares will not result in any additional benefit payments (such as 401(k) or bonus) beyond those provided by this Agreement to Plaintiffs, Class Members, and Plaintiffs, Class Members will be deemed to have waived all

such claims, whether known or unknown by them, as part of their release of claims under this Agreement. In addition, Plaintiffs, Class Members may not contribute any portion of their Settlement Shares to Defendant's 401(k) or other benefit plans if they exist.

1.      **No Admission of Liability.**  Defendant denies each and all of the claims alleged by Plaintiffs, Class Members in the Lawsuit. In addition, Defendant contends that it has complied with its obligations under federal law and California state law. Neither this Settlement, nor any document referred to or contemplated therein, nor any action taken to carry out this Settlement, is, may be construed as, or may be used as an admission, concession, or indication by or against Defendant of any fault, wrongdoing or liability whatsoever. This Settlement and the fact that Plaintiffs and Defendant were willing to settle the Lawsuit will have no bearing on, and will not be admissible in connection with, any litigation (other than solely in connection with the Settlement).  To this end, the settlement of the Class Action, the negotiation and execution of this Settlement Agreement, and all acts performed or documents executed pursuant to or in furtherance of this Settlement Agreement or the settlement are not, shall not be deemed to be, and may not be used as, an admission or evidence of any wrongdoing or liability on the part of Defendant or of the truth of any of the factual allegations in the operative complaints, and are not, shall not be deemed to be, and may not be used as, an admission or evidence of any fault or omission on the part of Defendant  in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.

2.      **Communications.**  The terms of this Agreement and Settlement shall remain confidential until they are presented to the Court in connection with the Motion for Preliminary Approval except that Defendant shall be permitted to make public statements about this Agreement or Settlement as necessary to comply with any state or federal law (including the federal securities laws) or rules and regulations of any securities exchange upon which Defendant's stock is listed or through a press release in connection with any such disclosure. Class Counsel and Plaintiffs agree that they will not issue any press release or press statement, or initiate media coverage, regarding this Settlement Agreement.

3.      **Documents Provided in Discovery.**  Plaintiffs and Class Counsel acknowledge that they are bound by the Stipulated Protective Order entered by the Court on February 10, 2020, and that Plaintiffs and Class Counsel shall abide by its terms.

4.      **Integrated Agreement.**  After this Agreement is signed and delivered by all Parties and their counsel, this Agreement will constitute the entire agreement between the Parties relating to the Settlement, and it will then be deemed that no oral representations, warranties, covenants, or inducements have been made to any Party concerning this Agreement other than the representations, warranties, covenants, and inducements expressly stated in this Agreement. All prior or contemporaneous agreements, understandings, and statements, whether oral or written, whether express or implied, and whether by a Party or a Party's counsel, are merged herein.

5.      **Attorney Authorization.**  Class Counsel and Defense Counsel warrant and represent that they are authorized by Plaintiffs and Defendant, respectively, to take all appropriate action required or permitted to be taken by such Parties pursuant to this Agreement to effectuate its terms, and to execute any other documents required to effectuate the terms of

this Agreement. The Parties and their counsel will cooperate with each other and use their best efforts to effect the implementation of the Settlement.

6.  **Modification of Agreement.**  This Agreement, and any and all parts of it, may be amended, modified, changed, or waived only by an express written instrument signed by all Parties or their successors-in-interest.  The Court's refusal to approve any term of this Agreement (other than the Gross Settlement Amount) shall not constitute grounds for voiding this Agreement.  The Parties agree that they shall work in good faith to modify any term of this Agreement (other than the Gross Settlement Amount) if necessary to obtain approval of this Agreement from the Court.

7.  **Agreement Binding on Successors.**  This Agreement will be binding upon, and inure to the benefit of, the successors of each of the Parties (including Released Parties) hereto, and their spouses, heirs, administrators, representatives, executors, successors and assigns each of which is entitled to enforce this Agreement, whether or not they actually receive a payment pursuant to this Settlement Agreement.  The Plaintiffs represent, covenant, and warrant that they have not, directly or indirectly, assigned, transferred, or encumbered any claim, demand, action, cause of action, or rights released in this Settlement Agreement.  This Settlement Agreement may be pleaded as a full and complete defense to any action, suit, or other proceeding that may be instituted, prosecuted, or attempted in breach of or contrary to this Settlement Agreement.

8.  **Cooperation in Drafting.**  The Parties have cooperated in the drafting and preparation of this Agreement. This Agreement will not be construed against any Party on the basis that the Party was the drafter or participated in the drafting.

9.  **Signatures Necessary.**  The Parties agrees that the signature of one Plaintiff is sufficient to constitute acceptance of this Agreement on behalf of the Class Members. Any Plaintiff who does not execute this Agreement prior to final approval is not eligible for a Class Representative Payment and shall be treated solely as a Class Member.

10.  **Counterparts and Signatures.** This Settlement Agreement may be executed in counterparts with signatures transmitted by facsimile or electronic signature.  When each Party has signed and delivered at least one such counterpart, each counterpart shall be deemed an original, and, when taken together with other signed counterparts, shall constitute one Settlement Agreement, which shall be binding upon and effective as to all Parties.

11.  **Fair Settlement.**  The Parties and their respective counsel believe and warrant that this Agreement reflects a fair, adequate and reasonable settlement of the Lawsuit and have arrived at this Settlement and this Agreement through arms-length negotiations, taking into account all relevant factors, current and potential and will so represent to the Court.

12.  **Headings.**  The descriptive heading of any section or paragraph of this Agreement is inserted for convenience of reference only and does not constitute a part of this Agreement.

13.  **Dispute Resolution.**  Except as authorized herein, all disputes concerning the interpretation, implementation, calculation, or payment of the Gross Settlement Amount or other disputes regarding implementation, calculation, or payment of the Gross Settlement Amount or

other disputes regarding compliance with this Agreement will be resolved by the Court. The Parties agree that they shall work in good faith to resolve any disputes that may arise before seeking the Court's intervention.

14.     **Invalid Provisions.** If any provision of this Agreement is determined to be invalid or unenforceable, all of the other provisions shall remain valid and enforceable notwithstanding, unless the provision found to be unenforceable is of such material effect that the Agreement cannot be performed in accordance with the intent of the Parties in the absence thereof.

15.     **Voiding the Settlement Agreement.** A failure of the Court to approve any material condition of this Settlement Agreement which effects a fundamental change of the terms of the settlement shall render the entire Settlement Agreement voidable and unenforceable as to Plaintiffs and Defendant, at the option of any Party. Any Party may exercise its or his option to void this Settlement Agreement as provided above by giving notice, in writing, to all other Parties and to the Court at any time prior to Final Approval.

a.     If more than five percent (5%) of the Class submits timely and valid requests for exclusion pursuant to the terms and procedures of the Notice of Settlement, this entire Settlement Agreement shall become voidable and unenforceable as to Plaintiffs and Defendant, at Defendant' sole discretion. Defendant may exercise such option by giving notice, in writing, to Class Counsel and to the Court at any time prior to Final Approval.

16.     **Notice.** All notices, demands or other communications given under this Agreement will be in writing and deemed to have been duly given as of the third business day after mailing by United States mail, addressed as follows:

*To Plaintiffs and the Class:*

> Kristina L. Hillman
> Jannah V. Manansala
> Roberta D. Perkins
> Caitlin E. Gray, Esq.
> Alexander Nazarov
> Maximillian Casillas
> Kara Gordon
> WEINBERG ROGER & ROSENFELD
> 1375 55th Street
> Emeryville, CA 94608
> Telephone: (510) 337-1001
> Facsimile: (510) 337-1023
>
> Aaron Kaufmann
> David Pogrel
> Amanda Eaton
> LEONARD CARDER LLP
> 1999 Harrison Street, Suite 2700

Oakland, CA  94612
Telephone:  (510) 272-1069
Facsimile:  (510) 272-0174

*To Defendant:*

Gary T. Lafayette
Brian H. Chun
Saisruthi Paspulati
LAFAYETTE & KUMAGAI
1300 Clay Street, Suite 810
Oakland, CA  94612
Telephone:  (415) 357-4600
Facsimile:  (510) 375-4605

**IN WITNESS WHEREOF**, the undersigned Parties and their duly-authorized representatives of accept and agree to the terms of this Agreement and hereby execute it voluntarily and with a full understanding of its consequences.

Date: _____

_____
Plaintiff

Date: _____

_____
Plaintiff

Date: _____

_____
Plaintiff

Date: _____

_____
Plaintiff

Date: _____

_____
By:
Title:
Defendant EQUILON ENTERPRISES LLC DBA
SHELL OIL PRODUCTS US

19

> Oakland, CA  94612
> Telephone:  (510) 272-1069
> Facsimile:  (510) 272-0174

*To Defendant:*

> Gary T. Lafayette
> Brian H. Chun
> Saisruthi Paspulati
> LAFAYETTE & KUMAGAI
> 1300 Clay Street, Suite 810
> Oakland, CA  94612
> Telephone:  (415) 357-4600
> Facsimile:  (510) 375-4605

**IN WITNESS WHEREOF**, the undersigned Parties and their duly-authorized representatives of accept and agree to the terms of this Agreement and hereby execute it voluntarily and with a full understanding of its consequences.

Date: 08/26/2022

_____
Plaintiff

Date:

_____
Plaintiff

Date:

_____
Plaintiff

Date:

_____
Plaintiff

Date:

_____
By:
Title:
Defendant EQUILON ENTERPRISES LLC DBA
SHELL OIL PRODUCTS US

Oakland, CA  94612
Telephone:  (510) 272-1069
Facsimile:  (510) 272-0174

*To Defendant:*

Gary T. Lafayette
Brian H. Chun
Saisruthi Paspulati
LAFAYETTE & KUMAGAI
1300 Clay Street, Suite 810
Oakland, CA  94612
Telephone:  (415) 357-4600
Facsimile:  (510) 375-4605

**IN WITNESS WHEREOF**, the undersigned Parties and their duly-authorized representatives of accept and agree to the terms of this Agreement and hereby execute it voluntarily and with a full understanding of its consequences.

Date:

_____
Plaintiff

Date:  08/29/2022

_____
Plaintiff

Date:

_____
Plaintiff

Date:

_____
Plaintiff

Date:

_____
By:
Title:
Defendant EQUILON ENTERPRISES LLC DBA SHELL OIL PRODUCTS US

19

Oakland, CA  94612
Telephone:  (510) 272-1069
Facsimile:  (510) 272-0174

*To Defendant:*

Gary T. Lafayette
Brian H. Chun
Saisruthi Paspulati
LAFAYETTE & KUMAGAI
1300 Clay Street, Suite 810
Oakland, CA  94612
Telephone:  (415) 357-4600
Facsimile:  (510) 375-4605

**IN WITNESS WHEREOF**, the undersigned Parties and their duly-authorized representatives of accept and agree to the terms of this Agreement and hereby execute it voluntarily and with a full understanding of its consequences.

Date:

_____
Plaintiff

Date:

_____
Plaintiff

Date: 08/26/2022

_____
Plaintiff

Date:

_____
Plaintiff

Date:

_____
By:
Title:
Defendant EQUILON ENTERPRISES LLC DBA
SHELL OIL PRODUCTS US

19

Oakland, CA  94612
Telephone:  (510) 272-1069
Facsimile:  (510) 272-0174

*To Defendant:*

Gary T. Lafayette
Brian H. Chun
Saisruthi Paspulati
LAFAYETTE & KUMAGAI
1300 Clay Street, Suite 810
Oakland, CA  94612
Telephone:  (415) 357-4600
Facsimile:  (510) 375-4605

**IN WITNESS WHEREOF**, the undersigned Parties and their duly-authorized representatives of accept and agree to the terms of this Agreement and hereby execute it voluntarily and with a full understanding of its consequences.

Date:

_____
Plaintiff

Date:

_____
Plaintiff

Date:

_____
Plaintiff

Date:  08/26/2022

_____
Plaintiff

Date:

_____
By:
Title:
Defendant EQUILON ENTERPRISES LLC DBA
SHELL OIL PRODUCTS US

19

# Exhibit A

**NOTICE OF CLASS ACTION AND PRIVATE ATTORNEY GENERAL ACT ("PAGA")
SETTLEMENT**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

---

*Marco DiMercurio, et al.*

     Plaintiffs,

v.

*Equilon Enterprises LLC dba Shell Oil Products US, et al*

Defendant.

---

Case No. 3:19-cv-04029-JSC

**READ THIS NOTICE CAREFULLY
REGARDING
YOUR
ENTITLEMENT TO COMPENSATION
FROM THIS SETTLEMENT AND
RELATED LEGAL RIGHTS**

TO:    OPERATORS WHO WORKED FOR EQUILON ENTERPRISES LLC. ("Equilon,"
"Shell" OR "Defendant") AT THE OIL REFINERY IN MARTINEZ, CALIFORNIA ANY
TIME BETWEEN JUNE 4, 2015 AND JANUARY 31, 2020.

You should have already received a class action notice authorized by the United States District
Court for the Northern District of California ("Court") in *Marco DiMercurio, et al., v. Equilon
Enterprises LLC dba Shell Oil Products US, et al.,* Case No. 3:19-cv-04029-JSC (the "Lawsuit")
informing you the Court had certified a class action and that you are a member of that certified
class. This notice regarding a proposed settlement of that class action has also been authorized by
the Court.  This is not a solicitation from a lawyer.

A proposed settlement (the "Settlement") has been reached in the Lawsuit, brought by four
former Equilon operators ("Plaintiffs").  The Settlement has been granted preliminary
approval by the Court.  A final settlement hearing will be held on _____, 2022 at
_____ in the Courtroom of Judge Jacqueline Scott Corley, located at 450 Golden Gate
Avenue, San Francisco, CA 94102 ("Final Approval Hearing").

The purpose of this Notice is to: (1) describe the Lawsuit, (2) inform you of the terms of the
Settlement and an estimate of how much you will receive, and (3) inform you of your rights
and options in connection with the Settlement.

     **You are estimated to receive payment from this Settlement of $_XXXXXXXXXX.**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | If you do nothing in response to this notice, you will remain in the Class, receive a settlement payment and release all claims covered by this Settlement. |
| **CHALLENGE YOUR PAYMENT** <br><br> **(BY XXX DATE)** | If you believe the information in Section XX, below, is incorrect and wish to dispute it, you must submit your challenge and describe the information you disagree with. Your dispute must be submitted by XX. Class Counsel and Defense Counsel will make a final and binding determination regarding any disputes. You will receive a settlement payment and release all claims covered by this Settlement after the dispute is resolved. |
| **EXCLUDE YOURSELF OR "OPT OUT"** <br><br> **(BY XXX DATE)** | If you "opt out" of the Class Action Settlement, you will not receive any payment from the Net Settlement Amount. In addition, the Release of Claims in the Settlement Agreement will not apply to you. You must notify the Settlement Administrator of your intent to opt out by XX |
| **OBJECT** <br><br> **(BY XXX DATE)** | You may write an objection to the Court stating why you do not like the Settlement. You may also appear in Court or use an attorney to appear for you and explain why you do not like the settlement. If you object, this does not mean you opt out of the class (in fact, if you opt out of the class, you will not be permitted to object to the settlement terms). You must submit your objection to the Court by XX. |

## 1.    WHAT IS THIS LAWSUIT ABOUT?

The Lawsuit claims, generally, that Shell violated provisions of the California Labor Code and Wage Order by: (1) failing to pay reporting time pay when operators were scheduled for standby shifts; (2) willfully failing to pay required reporting time pay upon termination; and (3) failing to provide accurate itemized wage statements. The Lawsuit also claims these violations amounted to unfair business practices under the California Business and Professions Code, and make Shell liable for civil penalties under the Private Attorneys General Act (PAGA). Shell disputes the claims and denies allegations that they violated California law. The Parties are confident each side has strong legal and factual positions to support their claims and defenses, but both sides recognize the risks and expenses associated with continued litigation.

The parties in the case have agreed to settle the Lawsuit and have entered into a written settlement (the "Settlement Agreement"), which the Court has preliminarily approved.

This Settlement is the result of good faith, arm's length negotiations between the Class Representatives and Shell, through their respective attorneys. Both sides agree that in light of the risks and expenses associated with continued litigation, the Settlement is fair and appropriate under the circumstances, and in the best interests of the Class Members.

The Court has not yet ruled on the merits of the Class Representatives' claims or Defendants' defenses. The Settlement is a compromise and is not an admission of liability on the part of Defendants.

## 2.    WHAT IS A CLASS ACTION AND WHO IS INVOLVED?

In a class action lawsuit, one or more people, called "Class Representatives," sue on behalf of themselves and others who have similar claims. All these people together are a "Class" or "Class Members." One court resolves the issues for everyone in the Class—except for those people who choose to exclude

themselves through a process called "opting out."  If the Court approves the settlement, people who remain in the Class may not file their own lawsuit on the issues that were resolved in the class action.

Here, the Class Representatives are former employees at Shell's Martinez Refinery named Marco DiMercurio, John Langlitz, Charles Gaeth, and Malcolm Synigal.

**3.      WHO IS IN THE CLASS?**

As mention in the earlier class action notice, the Class is defined as: All Operators working at the Shell refinery in Martinez, California, who were scheduled for standby shifts at any time from June 4, 2015 through January 31, 2020 (the "Class Period").

**4.      WHAT DOES THE SETTLEMENT PROVIDE?**

Defendants have agreed to create a settlement fund of $3,200,000 to settle this case (the "Gross Settlement Amount").  The Gross Settlement Amount will be divided among all Class Members, after deducting all sums approved by the Court for Plaintiffs' lawyers' fees $1,066,666.67,) and expenses ($45,000), payments to the Plaintiffs for their service to the Class ($30,000 total), payment to the State of California required by the Private Attorneys General Act ($37,500) and payments to the Settlement Administrator ($10,000) to finalize the settlement.

**5.      HOW MUCH CAN I GET FROM THE SETTLEMENT?**

The Net Settlement Fund will be distributed to Class Members who do not exclude themselves from the Class.  After deducting the amounts described above (Section 4), Each Class Member who does not opt out shall receive a proportionate share of the settlement, calculated based on the number of Standby Shifts between June 4, 2015 and January 31, 2020 (the "Class Period").


**Shell's records show that you were assigned #### Standby Shifts as an Operator during the Class Period. Based on this information your estimated settlement share is currently $_____,** _This amount is subject to change, either more or less, depending rulings to be made by the Court at final approval.

If you dispute the number of Standby Shifts use to calculate your award, you may contact the Settlement Administrator, as discussed in Section 6(ii) below.

Class Counsel is unable to offer advice concerning the state or federal tax consequences of payments to any Class Member. None of the Parties or Parties' attorneys make any representations concerning the tax consequences of the Settlement or your participation in it. Class Members should consult with their own tax advisors concerning the tax consequences of the Settlement. Class Members are solely responsible for determining the tax consequences of payments made pursuant to the Settlement and for paying taxes, if any, which are determined to be owed by each of them on such payments (including penalties and interest related thereto) by any taxing authority, whether state, local, or federal.

**6.      WHAT ARE MY OPTIONS?**

You have the following options with respect to the settlement:

      **(i)      <u>Stay in the Class</u>**

**If you stay in the Class and the Court grants final approval of the Settlement, you will receive your Settlement Payment.**  In exchange, you give up the right to sue Defendant for the claims resolved through this settlement.

To ensure you receive your Settlement Payment, all you need to do is keep the Settlement Administrator informed of your current mailing address.  Once the Court grants final approval of the Settlement, the Settlement Administrator will mail your check to the address on file for you.

### (ii)      Dispute the Information Used to Calculate Your Settlement Payment

The amount of your estimated settlement payment is based on the number of Standby Shifts that Shell's records show you were assigned between June 4, 2015 and January 31, 2020.  If you do not believe that the number of shifts is correct, you may dispute those numbers. Any such dispute must be mailed to the Settlement Administrator and **post-marked on or before [DATE]**. Disputes must state what you believe to be the correct values for these items and must be accompanied by any documentation you have to support your dispute. In addition, your dispute **must** include the case name (*DiMercurio, et al., v. Equilon*), your first and last name, signature, address, phone number, and last four digits of social security number for verification purposes.  Sending a dispute will not risk your right to a settlement payment.

Class Counsel and Defense Counsel will make a final and binding determination regarding any disputes. The Settlement Administrator will inform you of the final determination. If the Settlement receives the Court's final approval, your Settlement Payment check will be sent to you at the address on this Notice.

### (iii)    Opting Out of Class and Settlement Agreement

You can elect to not be part of the Class and not be bound by this Settlement Agreement, provided that you mail a signed written request to be excluded to the Settlement Administrator so that it is received no later than **XX/XX/2022.**

If you wish to opt out of the Settlement, you must set forth the following in writing: (a) the case caption; (b) your full name, address, and telephone number; (c) the term "Request for Exclusion" or "Opt-Out" at or near the top of the document; and (d) a statement that you want to opt-out and understand s/he will not receive any benefit under the Settlement.

You must personally sign the opt-out request.  You may not opt out by having a request to opt-out submitted by an actual or purported agent or attorney acting on your behalf.  If you do not submit a request to opt out that is substantially in compliance with this section within the deadline set by the Court, you shall be deemed to participate in the Settlement, be bound by all releases provided in this Settlement Agreement, and you shall be issued your portion of the Settlement amount.

If you timely submit an executed Opt Out Request, you will have no further role in the Class Action, and for all purposes, you will be regarded as if you never were either a party to the Action or a Class Member, and thus you will not be entitled to any benefit as a result of the Class Action and will not be entitled to or permitted to assert an objection to the Settlement.

### (iv)     Object to the Settlement

You can ask the Court to deny approval by filing an objection.  You can't ask the Court to order a different settlement or pay you a larger settlement payment; the Court can only approve or reject the Settlement described in this notice.  If the Court denies approval, no settlement payments will be sent out

and the lawsuit will continue.  If that is what you want to happen, you must object. **You cannot object to the Settlement if you request exclusion from the Settlement if you opt-out,** as provided above.

You may object to the Settlement before final approval of the settlement by the Court. In order to object to the Settlement or any portion of it, you should send any such written objection to the Settlement Administrator on or before **[DATE]**. Objections **must** state all of the reasons for your objection. In addition, any objection **must** include the case name (*DiMercurio, et al., v. Equilon*), your first and last name, address, phone number, and last four digits of social security number for verification purposes and must be signed by you or your attorney.  While the Court may permit objections to be filed up until the date of the Final Approval Hearing, you will only be assured that your objection will be considered if you submit it to the Settlement Administrator by the **[DATE]** deadline.

Even if you file an objection, you will be bound by the terms of the Settlement, including applicable releases as set forth above, unless the Court does not finally approve the Settlement.

**7.     WHAT IS THE DIFFERENCE BETWEEN OBJECTING AND OPTING OUT OF THE SETTLEMENT?**

If you object, you are telling the Court that you disagree with something in the Settlement and you are asking the Court to reject the Settlement. You still stay in the Class. If you object, but the Court still approves the Settlement, you will be bound by the Settlement you will receive your portion of the Settlement Amount.

If you request to opt-out/be excluded from the Class, you are telling the Court that you don't want to be part of the Class.  You will not receive any payment and will not be bound by any of the terms of the Settlement.  You would then have no basis to object, because the Settlement would no longer affect you.

**8.     WHAT AM I GIVING UP BY GETTING A SETTLEMENT PAYMENT?**

Accepting a Settlement Payment means that you can't sue, continue to sue, or be part of any other lawsuit against Defendants about the legal issues resolved by this settlement.  It also means that all of the Court's orders will apply to you and legally bind you.

**9.     WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?**

The Court has preliminarily approved the Settlement and will hold a hearing, called a Final Approval Hearing, to decide whether to give final approval to the settlement.  The Final Approval Hearing will be held at **XXX a./m. on XX, 2022** in Courtroom 8 of the United States District Court, Northern District of California, San Francisco Division located at 450 Golden Gate Ave, San Francisco, California 94102 before the Honorable Jacqueline Corley.  At the hearing, the Court will consider whether the settlement is fair, reasonable and adequate.  If there are objections, the Court will consider them.  Judge Corley will listen to Class Members who have asked to speak at the hearing.  The Court will also consider how much money to award Class Counsel and the amount of the enhancement payments to the named Plaintiffs/Class Representatives.  After the Final Approval hearing, the Court will decide whether to approve the settlement and will rule on Class Counsel's Motion for Attorneys' Fees and/or Expenses, the enhancement award for the named Plaintiffs/Class Representatives, and the settlement administrator's expenses.

In light of the continuing COVID-19 public health emergency, the Final Approval hearing may be conducted either by teleconference or videoconference.  The Court will provide information on how the hearing will be conducted prior to the date of the hearing until further notice.  The date of the hearing may change without further notice.  You should contact Class Counsel at least three (3) days prior to the hearing for additional information regarding the Fairness Hearing.  Class members may also check the Court's PACER site at https://ecf.cand.uscourts.gov to confirm that the date has not been changed.

**10.     DO I HAVE TO COME TO THE HEARING?**

No.  Class Counsel will answer any questions the Court may have.  However, you have the right to attend the Final Approval Hearing and be represented by your own lawyer at your own expense.  If you send an objection, you don't need to come to the Final Approval Hearing to talk about it.  As long as your objection was received on time the Court will consider it.

**11.     DO I HAVE A LAWYER IN THIS CASE?**

You do not need to hire your own lawyer.  The Court has decided that the interests of the Class, including you, are represented by:

> WEINBERG ROGER & ROSENFELD
> Kristina L. Hillman, Jannah V. Manansala, Roberta D. Perkins, Caitlin Gray, Alexander Nazarov, Maximillian D. Casillas, and Kara L. Gordon
> 1375 55th Street
> Emeryville, CA 94608
> Tel: (510) 337-1001

> LEONARD CARDER LLP
> Aaron Kaufmann, David Pogrel and Amanda Eaton
> 1999 Harrison Street, Suite 2700
> Oakland, CA 94612
> Telephone: (510) 272-0169

These lawyers will be paid from the settlement amount, so you will not be charged personally for their fees and costs on this case and in negotiating this settlement.  The lawyers are requesting one-third (1/3) of the Settlement Amount as their fees ($1,066,666,67,) and up to $45,000 for reimbursement of the expenses they paid to bring the Action.

Class Counsel's application for an award of attorney's fees and costs will be filed with the court by XXXXXXXXXXXXXXX_, 2022 and may be viewed in the court file at the United States District Court for the Northern District of California, located at 450 Golden Gate Ave, 16th Floor, San Francisco, California 94102 or on line at https://ecf.cand.uscourts.gov. You have a right to express your opinion about this request and the final decision on payment to the lawyers will be made by the Court. If you want to be represented by your own lawyer, you may hire one at your own expense.

**12.     HOW DO I GET MORE INFORMATION?**

This notice summarizes the proposed Settlement. For the precise terms and conditions of the Settlement, please see the Settlement Agreement available at XXX. At that same webpage, you will also be able to access Class Counsels' application for attorneys' fees and expense reimbursement. You may also contact Class Counsel listed under Question 11 above; access the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov; or

visit the office of the Clerk of the Court for the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Ave, 16th Floor, San Francisco, California 94102, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

**13.     WHAT HAPPENS IF MY ADDRESS HAS CHANGED OR CHANGES?**

Your payment will be sent to the address on this Notice. Therefore, if your address changes or is different from the one this Notice was sent to, you must correct it by notifying the Claims Administrator in writing, by First-Class U.S. Mail.

**PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE
TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS**

# EXHIBIT 2

# INVESTING IN WOMEN OF COLOR

## EAST BAY COMMUNITY LAW CENTER'S IMPACT IN 2021



## MISSION

To promote justice and build a community that is more secure, productive, healthy, and hopeful by providing:

- Legal services and policy advocacy that are responsive to the needs of low-income communities; and

- Law training that prepares future attorneys to be skilled and principled advocates who are committed to addressing the causes and conditions of racial and economic injustices and poverty.

## CONTACT

www.ebclc.org

(510) 548-4040

info@ebclc.org

1950 University Ave.
Suite 200
Berkeley CA 94704

2921 Adeline St.
Berkeley CA 94703

## TABLE OF CONTENTS

Executive Director Letter.................................2

Women of Color-Centered Platform...............3

Our Impact and Programs............................4

Featured Client Stories...................................7

Key Victories and Policy Wins......................13

Clinical Education and Alumni Engagement....16

Organizational Investments..........................18

2021 Financials............................................20

Board of Directors.........................................23

Donors..........................................................24

EAST BAY COMMUNITY LAW CENTER

2

# LETTER FROM OUR EXECUTIVE DIRECTOR



**Since March 2020, at the onset of the COVID-19 pandemic, East Bay Community Law Center has been on a journey.**

At that time, we reviewed more than two decades of client data to learn from crises of the past, including the 2008 mortgage foreclosure crisis and the 2016 presidential election. We found that during these times, Black and Latinx women consistently sought out our help with evictions, criminal justice, debt collection, immigration, public benefits and other services. We also learned that women of color were the primary entry point for children, spouses, friends and family members to access EBCLC's services. As the pandemic unfolded throughout 2020, we continued to track internal data and overlaid it with national statistics. Our findings showed women of color disproportionately bearing the brunt of unemployment, COVID-19 infections, and housing insecurity. In response, we designed a strategy to ensure our 30 years of community credibility could enable our clients to survive and even thrive in the face of the pandemic. Our leadership changed to mirror our programmatic shifts, as we recruited Board of Directors and Executive staff who were reflective of the clients we serve.

EBCLC launched 2021 with the aim to center women of color in our legal services, policy advocacy and clinical education. In the past year, we have made significant strides, from issuing a platform for bold public policies and legal reparations, to bolstering our evolution system to further improve our services. We invite you to learn more about what EBCLC has achieved and our lessons learned.

As I look ahead, I recall the words of one of my heroes, Fannie Lou Hamer. She said, "None of us are free until everybody's free." With the COVID-19 pandemic entering its third year, the work ahead requires a commitment: it is our responsibility to ensure that the same communities that have been have been historically excluded from public investment and resources, are not left behind in the eagerness to "go back to normal." EBCLC has adopted this value as our own. We are committed to advancing work to empower our clients and train the next generation of racial justice advocates to achieve our collective liberation.

Onward!

**ZOË MELISSA POLK**
*EXECUTIVE DIRECTOR*

*"IT IS EBCLC'S PRIVILEGE AND RESPONSIBILITY TO CENTER THE DIGNITY AND POWER OF WOMEN OF COLOR."*

—EBCLC's public statement on the unveiling of its "Know Justice Know Peace" community mural

---

# EAST BAY COMMUNITY LAW CENTER'S
## WOMEN OF COLOR-CENTERED PLATFORM

### WE BELIEVE IN:

**RELIEF AND FREEDOM FOR OUR UNDOCUMENTED WORKERS, STUDENTS, AND COMMUNITY MEMBERS** who kept our economy afloat during COVID-19. This must include expansion of DACA.

**HEALTHCARE FOR ALL.** Healthcare facilities must address racial disparities in health outcomes. They must ensure that their providers do not discriminate against their staff or patients.

**UNIVERSAL BASIC INCOME.** Meaningful cash disbursements that allow communities of color to compete with generational and historically white wealth.

**AN ENFORCEABLE RIGHT TO HOUSING.** All back rent must be waived and the eviction moratorium extended until the structural changes are made by the state and local government to address redlining.

**CANCELLATION OF STUDENT DEBT.** Student loan forgiveness will ensure that historic unemployment and a slow economy will not impoverish primarily Black borrowers.

**IMMEDIATE RELEASE OF ALL INCARCERATED YOUTH.** Investments must be made in families not the school-to-prison pipeline.

**RELEASE AND REPARATIONS FOR ALL ENSNARED IN THE FAILED WAR ON DRUGS.** Universal recognition that drug laws and enforcement must be accompanied by meaningful action to address the harm.

**A LIVING WAGE.** Compensation for essential workers and their families must be commensurate to their value.

# OUR IMPACT

In the last year, EBCLC made the following impact:

## OVER 4,000 PEOPLE SERVED

## 78 CLIENTS
increased their personal safety by working with our Name and Gender Change Workshop

## 98% OF CLIENTS
represented were not evicted due to our services

## A TOTAL OF $318,000
in consumer and student loan debt was discharged

## 120 LAW STUDENTS
were trained alongside our attorneys to provide holistic services to our clients

## 95% OF CLIENTS
who received full scope representation in Clean Slate Clinic cleared their criminal record

## 100% OF EBCLC'S IN-HOME SUPPORT SERVICES CASES
resulted in monetary compensation for women of color who are unable to work outside the home due to their child's exceptional needs





# OUR PROGRAMS



## CLEAN SLATE CLINIC

Provides legal services at the intersection of criminal and employment law. It represents clients on post-conviction record remedies in criminal court and engages in local and statewide criminal justice reform, particularly related to court debt and the criminalization of homelessness.

## COMMUNITY ECONOMIC JUSTICE CLINIC

Advance economic development through under-resourced, BIPOC (Black, Indigenous and people of color) entrepreneurs and business owners using a community-based, anti-displacement lens to create a more equitable local economy.

## CONSUMER JUSTICE CLINIC

Represents under-resourced plaintiffs to release them from unfenable debt from student loans, credit cards, pay day lenders, and settlement stakeholders who target immigrants and communities of color.

## EDUCATION DEFENSE AND JUSTICE FOR YOUTH (EDJY) CLINIC

Dismantles the school-to-prison pipeline by working with school districts to get police off of school campuses; closing youth jails; and building a national coalition to reform/eventually abolish youth electronic monitoring.

## HEALTH AND WELFARE CLINIC

Integrates lawyers directly into healthcare teams at high-need medical centers using Medical-Legal Partnerships to expand access to unemployment benefits and ensure that immigrant and mixed-status families maintain access to healthcare and nutrition.

## HOUSING CLINIC

Protects and promotes safe, healthy, and affordable housing for low-income tenants through eviction defense and local policy advocacy.

## IMMIGRATION CLINIC

Prioritizes complex legal remedies using a "Kindergarten-to-College" school-based model for parents and young people to access legal services in a safe space. EBCLC is also the only nonprofit in Alameda County providing free immigration remedies for people with past criminal convictions.

## SOCIAL WORK

Provides ongoing case management, crisis intervention, system navigation, and supportive advocacy to clients throughout the agency.

# FEATURED CLIENT STORIES

"Our commitment to a world in which race does not matter requires daily work."

— EBCLC's Statement on the 2021 U.S. Presidential Inauguration

8

# PROVIDING CLIENT-CENTERED LEGAL SERVICES



Candy Smallwood, Staff Attorney/Clinical Supervisor at EBCLC started her role with the Clean Slate Clinic during a monumental time. In February 2020, at the beginning of COVID-19, EBCLC achieved a critical victory in *Sanchez v. Caltrans*, a lawsuit to protect the rights of unsheltered people nationwide and restituting the Berkeley, Oakland, and Emeryville homeless community for their destroyed belongings in a $5.5M settlement.

Smallwood was very involved during the restitution process, working with almost 200 volunteers to process settlements and assist clients in filing their 8-page claim forms. A total of 1,174 people were compensated $1,100 each on average for loss of belongings. For Smallwood, one of the most significant parts of this major accomplishment is how EBCLC and volunteers were able to show up for the community.

One of Smallwood's clients, a 51-year-old African American woman, became homeless when management raised her rent to a point where she could no longer afford to pay it. She had to move, but she could not afford rent anywhere else. She told Candy that the hard part for her was that when she became homeless, she felt like there was no one there to help. She lost her home because she could not afford the raised rent, and then on top of that Caltrans took all of her belongings.

EBCLC staff and volunteers helped distribute the people who showed up to retrieve their claims were people of color. Many of these clients had become homeless for reasons tied to structural and systemic racism.

Smallwood's work with Decriminalization of Poverty and Homelessness, a subset of the Clean Slate, is deeply influenced by her history:

"I am the second oldest of 8 kids and growing up we lived in public housing. When my parents tried to look for places to live outside of public housing, as renters, no one wanted to rent to a Black family with eight kids. The experience of growing up in a very low-income community, like literally until my mid-20s, has shaped me."

Smallwood's work on Homelessness and Decriminalization of Poverty with EBCLC's Clean Slate Clinic exemplifies the holistic community core of the core of EBCLC's Women of Color-Centered Platform.

# PARTNERING WITH OAKLAND FOOD ENTREPRENEURS TO THRIVE

EBCLC's Community Economic Justice Clinic (CEJ) works to advance people-oriented economic development and empower low-income communities of color to build long-term solutions to poverty in the East Bay.

CEJ's nonprofit client Oakland Bloom exemplifies this mission by creating pathways to business ownership for poor and working-class refugee and immigrant food entrepreneurs in Oakland. It also provides additional support to protect these communities against displacement.

In 2017, Oakland Bloom sought legal advice from CEJ to start a cooperative restaurant group with the goal of providing more robust business support to its entrepreneurs. CEJ represented Oakland Bloom for

several years, offering legal assistance and technical support to enable the client to create a democratic cooperative business incubator.

In 2020, COVID-19 fundamentally impacted the small business community, resulting in permanent closures of many local businesses. The pandemic and the industry particularly hard. Impacting small businesses run by immigrants and primary caregivers, Oakland Bloom adapted to meet the shifting realities of the pandemic with CEJ's support.

In 2020, Oakland Bloom accepted an offer to take over a restaurant space as part owner to shape it into a cooperatively governed restaurant and community space to further its charitable goals. The worker-led restaurant, Understory, successfully launched in 2021. Composed of workers who are majority BIPOC, LGBTQ, and from immigrant backgrounds, the staff work together to shape operations, menu and labor conditions. Through this new initiative and collectively led kitchen, Oakland Bloom provides hands-on restaurant training to immigrant, refugee and other BIPOC and working class food entrepreneurs. Additionally, the restaurant creates pathways to ownership and dignity for workers who have faced



9

## CENTERING THE NEEDS OF YOUTH AND THEIR FAMILIES IN SCHOOLS

EBCLC met C*, a 14-year-old Black girl, in juvenile court after her first contact with the juvenile legal system. C was recently arrested and charged for an alleged incident at her school.

discrimination and other barriers in the industry. True to its name, 'Understory' represents the richly diverse ecosystems that thrive below a forest canopy and is a place that celebrates collective resilience.

She was scared but also angry — her school, where she was meant to feel safest, had turned its back on her, failing to support her in ways that she needed. At the same time, C and her mother were homeless, struggling to have even their most basic needs met. These needs only became more urgent once the COVID-19 pandemic began.

Our holistic legal and social work team worked in tandem to keep C out of the juvenile legal system and help her family move towards stability. While C's attorney in our Education Defense and Justice for Youth Clinic litigated to ultimately get C's case dismissed in the interest of justice, her social worker supported her family in obtaining a longer-term motel stay at the peak of the pandemic and collaborated with our Housing Clinic on permanent housing leads, helping them move into transitional housing. Her social worker also supported C's mother in securing employment and benefits and advocated for C's educational needs in distance learning, connected her with counseling, and ensured she and her mother had access to necessities by dropping off groceries, toiletries, and assisting with transportation.



Today, C and her mother live in their own apartment — her mother recently started a full-time job and C consistently attends school. Perhaps most importantly, C feels hopeful about her bright future ahead.

*Name changed for confidentiality

## ENABLING MOTHERS AND BABIES TO OBTAIN HOLISTIC CARE

EBCLC's Health & Welfare Clinic provides critical legal services to Alameda County residents who are at risk of poor health outcomes due to poverty, unsafe living conditions, discrimination, homelessness, inadequate health care coverage, and other destabilizing social conditions.

Since 2015, EBCLC has partnered with Alameda County and Highland Hospital on project DUICE (Developmental Understanding and Legal Collaboration for Everyone), a pediatric primary care intervention for children in the critical first six months of life. Ingrid Murillo, Paralegal at the Health & Welfare Clinic, works closely with DUICE's family specialist and doctor on managing referrals to EBCLC. Murillo works with the families and EBCLC's Immigration Clinic to gather information and build the most compelling cases to submit to Immigration Services.

In May 2019, Murillo informed EBCLC's Immigration Clinic of a specific DUICE client. She was a domestic violence survivor who fled her country with four kids while pregnant, and gave birth after arriving in the U.S. EBCLC's immigration lawyers decided to represent the family. In March 2021, San Francisco Immigration Court decided the case in the family's favor — granting a positive asylum application for the mother and her four children, effectively terminating the deportation proceedings. Murillo views this case as a huge win, citing that this family was assisted by EBCLC in multiple areas

## SUPPORTING OUR IMMIGRANT CLIENTS TO REALIZE HEALTHY AND THRIVING LIVES

**EBCLC worked with N*, an asylum seeker from Mexico, and her four children in the past year.**

During our Immigration Clinic's time working with N on her asylum case, significant challenges arose.

including social work, housing, and immigration:

*"We look at the whole case. The holistic intake we do gives families a connection to so many resources, utilizing EBCLC's internal referrals. We build rapport with the family, which helps them feel satisfied and connected. The way that we work with the DULCE team gives us follow-through and impact for the families that is rarely seen."*

She faced ongoing threats from her ex-partner and was diagnosed with COVID-19 while she was pregnant; she had also moved almost two hours away from Berkeley, where EBCLC is based, which presented an obstacle to transportation to in-person meetings. Additionally, N lacked computer access, making virtual meetings with her attorney difficult – this become more taxing with a recent newborn. Our attorneys and social workers found workarounds to guarantee that EBCLC was still able to regularly connect with N remotely on her case proceedings.

We are proud to share that in 2021, N was granted asylum. Her children, who were present for the final video hearing from the judge, were granted derivative asylum status as well. Beyond having the security of being authorized to stay in the country, she is now also eligible to work and obtain public benefits for her and her children like CalWORKs, Calfresh and Medi-Cal.

*"EBCLC helped me so much and I am thankful every day that I found an organization like EBCLC, whose work went above and beyond to help me win my asylum case,"* she said. With EBCLC's continued advocacy, N and her children have begun a more secure life together.



## KEY VICTORIES AND POLICY WINS

*"EBCLC aims to uplift whole communities by centering women of color. Not only have we borne the brunt of the COVID-19 crisis, but we have also been the lifeline of families, neighborhoods, and the entire country during this pandemic."*

— EBCLC's statement on the Release of its Findings on Vaccinations Among Women of Color Clients

14

# KEY VICTORIES FOR WOMEN OF COLOR

As a women of color-led and centered organization, EBCLC has and will continue to invest in strategies and solutions for women of color. This is the first year that we have focused on this platform as a result of an in-depth analysis of existing client data as well as an organization-wide recommitment to racial justice work.

Based on EBCLC's data and existing national research published during the COVID-19 pandemic, we understand that women make up the majority of essential workers in the US and are on the frontlines of all impacted groups. It is through investing in women of color first that EBCLC is able to transform and uplift entire families and communities.

One way in which we practice this ideology every day is by closely examining our policy advocacy efforts to ensure that the bills and measures that we endorse benefit women of color. Staff engage the authors of bills and coalition partners to understand their effects on this group, and continue to advocate for systems-level changes that improves their lives.



# POLICY WINS

Examples of our policy work in the past year include advancing:



### Eviction Moratorium

As a leader in housing justice, EBCLC played a key role in creating and advocating for the eviction moratorium in Alameda County. Despite national and state moratoriums ending, Alameda tenants will continue to be protected from all eviction notices served or unlawful detainer complaints filed from March 24, 2020 through at least 60 days after the County public health emergency is lifted.



### Alternatives to Youth Incarceration

EBCLC was an active member of the Free Our Kids Coalition, which halted Alameda County's plan to spend $75 million to rebuild its 100-bed juvenile probation camp, Camp Sweeney. The Coalition also advocated for the release of incarcerated youth during the pandemic and centered the needs of impacted youth and residents in the implementation of Senate Bill 823, which closes the state's youth prisons.



### Anti-Displacement Strategies

EBCLC's anti-displacement policies prioritize low income renters and communities of color and create pathways to homeownership. Our Tenant Opportunity to Purchase Act (TOPA) policies give tenants options to have secure housing when the property they rent goes up for sale, while also preserving affordable housing.





### Driver's License Suspensions

EBCLC represented plaintiffs in the lawsuit, Hernandez v. CA Department of Motor Vehicles, challenging the DMV's suspension of licenses. As a result, the DMV lifted 554,997 improperly imposed suspensions, allowing working-class people affected by the lawsuit to drive legally, work, and resume supporting their families.



### Debt Protection for Working Families

EBCLC worked to expand protections for working class people against predatory debt settlement companies through bill AB 1405, which passed in October 2021. It will strengthen consumer rights, increase transparency, and improve regulation to protect low-income residents in California from unfair practices in the debt settlement industry.

### Gender Marker Changes on Federal IDs

EBCLC advocated for changes to federal policies to make it easier for transgender and gender non-conforming (TGNC) people to change their gender marker on their passports. In June 2021, the State Department announced that it would no longer require applicants to submit medical certification to change the gender marker, allowing TGNC people to live more authentically and increasing access to medical services and employment.

# CLINICAL EDUCATION AND ALUMNI ENGAGEMENT

## CLINICAL EDUCATION

EBCLC maintains a dynamic collaboration between clinical supervising attorneys and law students. Over the past year, 120 students received training as community lawyers.

"Getting the opportunity to represent clients in court this year has been a privilege and an essential learning experience. I came to law school to develop the skills necessary to be an effective advocate for those impacted by the criminal legal system... While representing a young person facing felony charges, I argued for his release from juvenile hall in a detention hearing, negotiated reduced charges with the DA, facilitated a plea colloquy, argued for the least restrictive probation sentence, and continue to represent him in regular status updates. Through this work, I learned the social dynamics, language and culture of juvenile delinquency court. Because of this experience, I feel more prepared to advocate for my clients in court as a public defender after graduation."

**– Madison Ordway, Education Defense and Justice for Youth Services**

# ALUMNI ENGAGEMENT

In its 2021 Alumni Engagement Survey, we heard from over 150 alumni and learned that a majority of our alumni launch their careers in public service.



"My family is Black Jamaican American, and I'm first generation American, so growing up we faced a lot of issues at the intersection of criminal law and immigration. Because of this, I was always very acutely aware of the school to prison pipeline and I wanted to join a clinic where I could do a lot of work towards dismantling that system. I joined Education Defense and Justice for Youth because there are so many issues facing the world, specifically minorities facing so many problems, and I wanted to do work that could make a difference."

**– Alycia Tulloch, Associate Frankfurt Kurnit Klein & Selz (Education Defense and Justice for Youth '19)**



"As a lawyer for the reproductive justice movement, EBCLC helped me develop an intersectional law practice and career. Whether launching Esq. Apprentice — an Oakland based non-profit helping low-income women of color become lawyers via legal apprenticeship — or returning to my alma mater to run the Center on Reproductive Rights & Justice, EBCLC helped me hone my instincts as a community lawyer and inspired me to use my legal education creatively and for the benefit of low-income communities."

**– Rachel Johnson-Farias, Esq., Founding Executive Director, Esq. Apprentice (Health and Welfare,'12)**



"I went to Law School to become an advocate for families like mine dealing with housing instability. Working in the housing clinic of EBCLC I learned from some of the best housing lawyers in the country fighting to keep people in their homes. At EBCLC, I got plenty of hands-on experience in the courtroom representing families fighting to stay housed. After graduation, I wanted to take what I learned at EBCLC back to Denver. In 2020, I co-founded an eviction defense non-profit to keep Colorado renters in their homes and I am now running for the State Legislature to pass better renter protections in the Colorado State House."

**– Javier Mabrey, Candidate for Colorado HD1, (Housing '19)**

# ORGANIZATIONAL INVESTMENTS

"In a victory for the entire organization, the East Bay Community Law Center has reached a collective bargaining agreement amidst the COVID-19 pandemic and national discourse on valuing the dignity of workers."
- EBCLC's public statement on the successful execution of our first Collective Bargaining Agreement

## WHO IS EBCLC STAFF?

**60%** are women of color

**8%** identify as transgender or nonbinary

**79%** identify as BIPOC

**54%** of programs staff are multiply-licensed in their work at EBCLC

**31%** identify as LGBTQIA+

**76%** identify as female

## FEATURED STAFF QUOTES



"Every day I live, I honor the lives of my grandmother who was forced into internment camps because of the color of her skin, and my mother who was born there. She grew up ashamed of the color of her skin but made sure to raise me with a deep appreciation for who I am as a fourth-generation Japanese American. I gratefully carry their painful legacy on my shoulders with respect, dignity and perseverance and strive to make them proud of whom I have become because of their sacrifices."

— **Shauna Fujimoto, Contracts Officer**



"I have assisted so many Black women clients, for many years now here at EBCLC. I have helped change lives and save their housing. I am honored to be on the best housing team in the bay and still be happy doing this work."

— **Gracie Jones, Project Manager, Housing Clinic**



"As an undocumented Mexican living in this country who's had the opportunity to pursue higher education I feel like it is my duty to help individuals who do not have the same opportunities to pursue higher education and navigate a broken immigration system. My family, friends, and community are who inspire me because immigration is not a Latinx issue but a human rights issue."

— **Ramon Becerra Alcantar, Paralegal & DOJ Accredited Legal Representative, Immigration Law Clinic**

# FINANCIALS

## STATEMENT OF FINANCIAL POSITION

| ASSETS | FY2021 | FY2020 |
|---|---|---|
| **Current Assets** | | |
| Cash and cash equivalents | 4,357,364 | 1,852,162 |
| Cash held in trust | 422,174 | 346,318 |
| Investments | 2,005,232 | 1,642,419 |
| Grants, pledges & accounts receivable | 1,883,741 | 1,331,269 |
| Prepaid expenses | 168,949 | 115,642 |
| **Total Current Assets** | 8,837,460 | 5,287,810 |
| Property and equipment, net | 1,536,694 | 1,586,186 |
| Deposits | 29,328 | 29,328 |
| **TOTAL ASSETS** | 10,403,482 | 6,903,324 |
| **LIABILITIES AND NET ASSETS** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued expenses | 128,398 | 88,737 |
| Accrued vacation | 477,406 | 439,757 |
| Deferred revenue | 343,608 | 516,817 |
| Client trust accounts | 421,580 | 345,725 |
| Refundable Advance-PPP | | 127,557 |
| **Total Liabilities** | 1,370,992 | 1,518,593 |
| **Net Assets** | | |
| Without donor restrictions | 5,841,377 | 4,104,825 |
| With donor restrictions | 3,191,113 | 1,279,906 |
| **Total Net Assets** | 9,032,490 | 5,384,731 |
| **TOTAL LIABILITIES AND NET ASSETS** | 10,403,482 | 6,903,324 |

## STATEMENT OF ACTIVITIES

| | WITHOUT DONOR RESTRICTIONS | WITH DONOR RESTRICTIONS | TOTAL |
|---|---|---|---|
| **SUPPORT AND REVENUE** | | | |
| **Support** | | | |
| Government awards | 3,788,666 | | 3,788,666 |
| Foundation and community grants | 735,944 | 3,802,667 | 4,538,611 |
| Contributions | 1,529,444 | 275,018 | 1,804,462 |
| **Total Support** | 6,054,054 | 4,077,685 | 10,131,739 |
| **Revenue** | | | |
| Affiliation Agreement | 1,067,657 | | 1,067,657 |
| Attorney fees and costs | 1,037,235 | | 1,037,235 |
| Investment activity, net | 363,180 | | 363,180 |
| Other | 9,381 | | 9,381 |
| **Total Revenue** | 2,477,453 | | 2,477,453 |
| Support provided by expiring time and purpose restrictions | 2,167,020 | (2,167,020) | |
| **TOTAL SUPPORT AND REVENUE** | 10,698,527 | 1,910,665 | 12,609,192 |
| **EXPENSES** | | | |
| Program | 6,789,931 | | 6,789,931 |
| Management and General | 1,517,530 | | 1,517,530 |
| Fundraising | 653,972 | | 653,972 |
| **TOTAL EXPENSES** | 8,961,433 | | 8,961,433 |
| Change in Net Assets | 1,737,094 | 1,910,665 | 3,647,759 |
| Net Assets, beginning of year | 4,104,825 | 1,279,906 | 5,384,731 |
| **NET ASSETS, END OF YEAR** | 5,841,919 | 3,190,571 | 9,032,490 |

# EXHIBIT 2

22

# BREAKDOWN OF GIVING




- 20.3% Restricted Funding
- **14.3%** Contributions
- **10.0%** Affiliation Agreement
- 9.7% Attorney Fees & Costs
- 6.5% Grants
- 3.4% Investment
- 0.5% Other
- 35.4% Government Awards

---

# BOARD OF DIRECTORS



Denise Abrams
Eesha Anand
Michelle Wilde Anderson
Katherine L. Benson
Jessica (Jessie) Buendia
Peter H. Carson
Frank Ciolone
Saxon Cropper-Sykes
E. Venessa Henlon
Christin Hill
Luan Huynh

Ellen Ivens-Duran
Sandra Johnson
Amanda Karl
Michael S. Kwun
Monique Uburd
Michael J. Loeb
Daren G. Lowhurst
James R. Meehan, Treasurer
Samuel R. Miller
Saira Mohamed
Michelle Natividad Rodriguez

Michael K. Ng, Chair
Sneh Rao
Kennedy Rose
Andrea Roth
Maureen A. Sheehy, Secretary
Tirien Steinbach
Tiffany R. Thomas
Stephanie Tilden
Steven Tindall
Steven G. Zieff

23

# DONORS

Our work is made possible because of your investment. We extend deep appreciation to the following individuals, foundations, law firms, and businesses who contributed to EBCLC between July 1, 2020 and June 30, 2021.

## LEADERSHIP

## CHAMPIONS

## ADVOCATES

## FRIENDS

## CY PRES



CONTACT

www.ebclc.org

(510) 548-4040

info@ebclc.org

1950 University Ave
Suite 200
Berkeley CA 94704

2921 Adeline St
Berkeley CA 94703

EAST BAY
COMMUNITY
LAW CENTER