UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO DIMERCURIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EQUILON ENTERPRISES LLC,<br><br>Defendant. | Case No. 3:19-cv-04029-JSC<br><br>**ORDER RE: MOTION FOR FINAL APPROVAL; MOTION FOR ATTORNEY'S FEES, COSTS, AND INCENTIVE AWARD**<br><br>Re: Dkt. Nos. 242, 244 |

Plaintiffs are operators at a Shell oil refinery owned by Equilon Enterprises, LLC ("Defendant" or "Shell"). They allege Defendant's standby practices violate California's wage-and-hour laws, Unfair Competition Law, and Private Attorneys General Act. Following class certification, the parties reached a settlement, which the Court preliminarily approved. (Dkt. Nos. 181, 191, 241.[1]) Plaintiffs' motions for final approval and for an award of attorney's fees, costs, and an incentive award are now pending before the Court. (Dkt. Nos. 242, 244.) Having considered Plaintiffs' motions and the relevant authority and having had the benefit of oral argument on May 9, 2024, the Court GRANTS the motion for final approval and GRANTS the motion for attorney's fees, costs, and incentive awards.

**BACKGROUND**

Defendant ("Shell") owned and operated an oil refinery in Martinez, California. (Third Amended Class Action Complaint, Dkt. No. 157 ¶ 2.) The four Class Representatives worked as operators at the refinery until it was sold on January 31, 2020. (*Id*. ¶¶ 10–14.) Shell required operators to be available for designated 12-hour standby shifts in addition to their regular 12-hour

---

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

1  shifts. (*Id*. ¶ 2.) There were two 1.5-hour standby periods each day. (*Id*. ¶¶ 3, 5.) During the
2  standby period, operators had to be reachable by phone in case Shell called the operator to cover
3  an unscheduled absence. (*Id*. ¶ 3.) If called in, the operator had to arrive at the refinery within two
4  hours. (*Id*.) If not called in, the operator was not paid. (*Id*. ¶¶ 3, 9.)

5        The operative complaint asserts claims for "Failure to Pay Reporting Time Pay" in
6  violation of California Industrial Welfare Commission Wage Order 1-2001; "Failure to Pay All
7  Wages Earned at Termination" in violation of California Labor Code §§ 200-203; "Failure to
8  Provide Accurate Wage Statements" in violation of Labor Code §§ 226, 226.3; "Unfair Business
9  Practices" in violation of California's Unfair Competition Law, Business and Professions Code §
10 17200; and civil penalties under California's Private Attorneys General Act ("PAGA"), Labor
11 Code § 2698. (*Id*. ¶¶ 38–64.)

12       In August 2021, the Court granted Plaintiffs' motion for class certification. (Dkt. Nos.
13 116, 144.) The parties participated in three settlement conferences with Chief Magistrate Judge
14 Spero between May 2021 and June 2022. (Dkt. Nos. 98, 133, 161.) After the third settlement
15 conference, they agreed on major terms, executed a Memorandum of Understanding, and finalized
16 a Settlement Agreement. (Dkt. No. 171-1 at 2–3, 7–37.) Plaintiffs then filed their motion for
17 preliminary approval and proposed class notice. (Dkt. Nos. 171, 172, 175.) At oral argument on
18 October 20, 2022, the Court expressed some concerns with the notice. In response, the parties
19 submitted a first amended proposed class notice. (Dkt. No. 178.) The Court identified its
20 remaining concerns in a written order, (Dkt. No. 179), and the parties submitted a second amended
21 proposed class notice, (Dkt. No. 180 ) On December 14, 2022, the Court granted Plaintiffs'
22 motion for preliminary approval. (Dkt. No. 181.)

23       Over the ensuing months and upon further investigation, the parties determined there were
24 additional Class Members who required notice and that it was necessary to reformulate how
25 certain class damages were calculated. (Dkt. No. 191.) The Court thus amended its prior
26 preliminary approval order to account for these matters. (*Id*.) Plaintiffs then discovered there
27 were additional issues with the class data regarding scheduled standby shifts and related pay
28 history and the parties attended further settlement conferences with Judge Spero on June 14, 2023

and September 7, 2023.  (Dkt. Nos. 197, 214.)  The parties then entered into a Revised Settlement Agreement and sought preliminary approval of the revised settlement.  (Dkt. No. 230.)  The Court issued a second amendment to the preliminary approval order preliminarily approving the revised settlement and requiring notice.  (Dkt. No. 241.)  The underlying motions for final approval and for attorney's fees, costs, and incentive awards followed.  (Dkt. Nos. 242, 244.)

## SETTLEMENT TERMS

### A. Class

The certified class is defined as "[a]ll Operators working at the [Shell] refinery . . . in Martinez, California, who were scheduled for standby at any time from June 4, 2015, . . . up to and continuing through January 31, 2020." (Dkt. No. 230 at 7.)  There are two certified sub-classes:

> **2016 to 2019 Waiting Time Penalties Sub-Class**: All Class Members who have been employed and separated from employment (either by involuntary termination or resignation) at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California, at any time from June 4, 2016 through June 3, 2019, and who, upon separation from employment, did not timely receive all wages owed as a result of reporting obligations.
>
> **2019 to 2020 Waiting Time Penalties Sub-Class**: All Class Members who have been employed and separated from employment (either by involuntary termination or resignation) at the refinery of Equilon Enterprises LLC dba Shell Oil Products US in Martinez, California, at any time from June 4, 2019 through January 31, 2020, and who, upon separation from employment, did not timely receive all wages owed as a result of reporting obligations.

(Dkt. No. 230 at 7.)

### B. Payment Terms

The Settlement Agreement requires Defendant pay $3,600,000 into an interest maximizing Qualified Settlement Fund created by the Settlement Administrator within 30 days of final approval.  (Dkt. No. 230 at 9, 11-12.)  This amount will be distributed to Class Members on a pro rata basis based on the number of days they were assigned one or more standby shifts, after certain deductions are made.  The deductions, which are subject to Court approval, include attorney's fees and litigation expenses ($1,244,617.98), incentive awards ($30,000), payment to the California Labor Workforce Development Agency for settlement of the PAGA penalties claim ($42,187.50), and settlement administration costs ($11,500).

The settlement is non-reversionary and any uncashed settlement checks will be distributed to the *cy pres* recipient, the East Bay Community Law Center. (Dkt. No. 230 at 16, 19.)

### C. Release

Class members who do not timely opt out of the settlement, release the following:

> any and all claims against the Released Parties that were alleged in the complaint brought in this Lawsuit and all claims that could have been brought based on the allegations in the operative Complaint, related to payment of wages, penalties, interest, fees, costs, and all other claims and allegations made in the operative Complaint, from June 4, 2015 through January 31, 2020 . . . .

(*Id*. at 21.) The named Class Representatives release a broader set of claims arising out of their employment. (*Id*. at 20–21.)

### D. Notice

Following preliminary approval, the Settlement Administrator, CPT Group, mailed the Notice packet to each Class Member, with instructions on how to opt-out, object, or challenge their settlement allocation. (Dkt. No. 244-1 at ¶ 7, Ex. A.) The notice also informed Class Members about the website and a toll-free telephone number established for Class Member inquiries. (Dkt. No. 241-1 at ¶ 8; Ex. A.) On February 12, 2024, following the second amended order granting preliminary approval of the revised Settlement Agreement, the Settlement Administrator reissued notice to the class. (Dkt. No. 241.) One of the notice packets was returned, but resent following skip tracing. (Dkt. No. 246 at ¶¶ 2-3.)

### E. Objections and Requests for Exclusion

To date, no objections or requests for exclusion have been received. (Dkt. No. 246 at ¶¶ 4, 5.)

## DISCUSSION

The approval of a settlement is a multi-step process. At the preliminary approval stage, the court should grant such approval only if it is justified by the parties' showing that the court will likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class

4

will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must finally determine whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## I. CLASS CERTIFICATION

The Court previously certified a class under Rule 23(b)(3). (Dkt. No. 116.) Thus, "the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." Fed. R. Civ. P. 23 Advisory Committee's Note to 2018 Amendment. Nothing in the current submission gives the Court reason to reconsider its prior certification order.

## II. ADEQUACY OF NOTICE

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice includes "[n]otice of the motion [for attorney's fees] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). Notice of the motion for attorney's fees is required in both common fund and statutory fee cases. *See* Fed. R. Civ. P. 23 advisory committee's note (2003) ("Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances."); *see also* 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 8:22 (6th ed. Nov. 2023 update) ("whether or not class members are paying counsel's fee directly, fee notice plays an important role in class members' capacity to evaluate the fairness of the settlement

5

itself.").

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (cleaned up). Although Rule 23 requires reasonable efforts be made to reach all class members, it does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable" notice, not "actually received" notice).

The Court finds the notice plan previously approved by the Court, as implemented by the Settlement Administrator, CPT Group, complies with Rule 23(c)(2)(B). First, the content of the first Notice and amended Notice was sufficient under Rule 23(c)(2)(A). (Dkt. No. 230 at 30.) Second, all 341 Class Members were mailed notice packets and only one of these was returned. (Dkt. No. 246 at ¶ 2.) Following skip-tracing, the packet was mailed to a new address and has not been returned. (*Id*.) Third, six disputes were received regarding the number of stand-by shifts, but after investigation, all disputes were denied. (*Id*. at ¶ 6.) Fourth, CPT created a website: www.cptgroupcaseinfo.com/equilonenterprisesettlement, which contains all the required documents. (Dkt. No. 244-1 at ¶ 8.) CPT also offered a toll-free phone number for Class Member inquiries. (*Id*.) Finally, no objections or requests for exclusion were received. (Dkt. No. 246 at ¶¶ 4-5.)

### III.    *CY PRES* AWARD

A *cy pres* award is "a tool for 'distributing unclaimed or non-distributable portions of a class action settlement fund to the next best class of beneficiaries.'" *In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1111 (9th Cir. Dec. 27, 2021) (quoting *Nachsin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011). "*Cy pres* distributions must account for the nature of

6

the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin*, 663 F.3d at 1036.

The parties have selected the East Bay Community Law Center (EBCLC) as the *cy pres* recipient. (Dkt. No. 230 at 19.) However, as discussed at oral argument, given this case involves unpaid wages and class member recovery is considerable, it is more appropriate to deposit any unclaimed funds with the California Unclaimed Properties Fund. The parties agreed to this proposal. Accordingly, for any checks that remain uncashed after 120 days from mailing, the Settlement Administrator shall mail the funds to the California Unclaimed Properties Fund to be held in the Class Member's name.

## IV. FINAL APPROVAL OF THE SETTLEMENT AGREEMENT

To grant final approval, the Court must find the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e). In making this determination, courts generally must consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). Under the revised Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding courts must apply the collusion factors set forth in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as those settled before certification.) When the settlement is reached pre-certification, however, the court must apply "an even higher level of scrutiny" and "substantively grapple with whether the *Bluetooth* warning signs created an unfair settlement." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 608 (9th Cir. 2021) (cleaned up).

### A. The Fairness Factors

#### 1. The Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of [Plaintiffs'] case on the merits balanced against the amount offered in the settlement." *See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal quotation marks and citation omitted). Although this action settled before the Court ruled on the merits of Plaintiffs' claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id.* (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*

Here, although Plaintiffs believe they have a strong case, they recognize the expense, risk, and length of continued proceedings necessary to prosecute the action through trial and potential appeal. Defendant contests the merits of their claims as well as the appropriateness of class certification. In addition, damages could be difficult to prove as Defendant did not have an official mechanism to track which standby shifts were traded, activated, or otherwise not compensable. (Dkt. No. 244 at 13.) Given the risks posed by continuing to litigate Plaintiffs' claims, the certainty of Class Member recovery under the settlement weighs in favor of granting final approval.

#### 2. Settlement Amount

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc.*, 221 F.R.D. at 527. "[I]t is well-settled law that a

1  proposed settlement may be acceptable even though it amounts to only a fraction of the potential

2  recovery that might be available to the class members at trial." *Id*. (collecting cases).

3      Plaintiffs estimate Shell's total exposure is $8,550,000. (Dkt. No. 244 at 14.)  The gross

4  settlement fund of $3,600,000 is about 37 percent of the total exposure.  (*Id*.)  Continued litigation

5  brings a risk Plaintiffs will receive nothing, especially because Plaintiffs' claims are inter-

6  connected and derivative of the same reporting time pay issue.  (Dkt. No. 181 at 7.)  In contrast, by

7  virtue of the settlement, Class Members can each expect to receive on average approximately

8  $6,661.86 with awards ranging between approximately $129.46 and $19,288.95; 75 people will

9  receive at least $10,000.  (Dkt. No. 246 at ¶ 7.)

10      This factor thus weighs in favor of final approval.

11          **3.**    **Extent of Discovery Completed and Stage of Proceedings**

12      In the context of class action settlements, as long as the parties have sufficient information

13  to make an informed decision about settlement, "formal discovery is not a necessary ticket to the

14  bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a

15  court's focus is on whether "the parties carefully investigated the claims before reaching a

16  resolution." *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014).

17      The Settlement Agreement is the result of multiple separate settlement conferences with

18  Chief Magistrate Judge Spero. *See Satchell v. Fed. Exp. Corp*., No. C 03–2659 SI, 2007 WL

19  1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the

20  settlement process confirms that the settlement is non-collusive."). Plaintiffs' counsel went

21  through extensive document production, multiple depositions, and class certification prior to

22  settlement.

23      This factor thus likewise weighs in favor of final approval.

24          **4.**    **Experience and Views of Counsel**

25      The experience and views of counsel also weigh in favor of approving the settlement.

26  Class Counsel has extensive experience in wage and hour class actions and strongly support

27  approval of the settlement given the risks and challenges involved.  (Dkt. No. 242-5 at ¶ 9, Dkt.

28  No. 242-6 at ¶¶ 3-5.)

### 5. Presence of a Government Participant

No government entity is a party to this action. However, because Defendant removed this action pursuant to CAFA, the relevant state and federal officials had to be notified of the settlement pursuant to 28 U.S.C. § 1715(b). *See Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co*., 844 F.3d 1133, n.2 ("In addition to §§ 1332(d) and 1453, CAFA also includes §§ 1711-1715, which relate to approval of settlements in class actions."). Defendant provided notice to the relevant agencies on May 8, 2024. (Dkt. No. 249.) Accordingly, the parties have stipulated this final approval order shall be held in abeyance for 90 days to allow any objections to be heard. (Dkt. No. 248.)

### 6. Reaction of Class Members

As previously discussed, the Settlement Administrator mailed the initial Notice and revised Notice to all 341 Class Members and only one was returned, which was remailed following an address update. (Dkt. No. 246 at ¶¶ 2-3.) No objections or requests for exclusion have been received. (*Id*. at ¶¶ 4-5.) "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc*., 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also Churchill Vill.,* 361 F.3d at 577 (holding approval of a settlement that received 45 objections (0.05%) and 500 opt-outs (0.56%) out of 90,000 class members was proper).

\*\*\*

In sum, the fairness factors weigh in favor of granting Plaintiffs' motion for final approval of the class action settlement.

### B. The *Bluetooth* Factors

Finally, the Court must determine whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig*., 654 F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members

10

to infect the negotiations." *Id*. The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id*. at 947 (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the payout to the class to class counsel's claim for fees. *See Harris v. Vector Mktg. Corp*., No C-08-5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011) (examining "whether a disproportionate part of the settlement is being awarded to class counsel" under the settlement agreement). Under the Settlement Agreement, Class Counsel can apply to the Court for an award of attorney's fees not to exceed one-third of the gross settlement amount or $1,200,000. (Dkt. No. 230 at 13.) This percentage alone may be a sign of collusion. *See Bluetooth*, 654 F.3d at 947. However, because Class Counsel's lodestar is $1,809,105, the fee requested equals a negative multiplier of approximately 34 percent. (Dkt. No. 242 at 16.) Thus, while the high percentage is a red flag, it does not raise a concern regarding collusion.

The second warning sign—a "clear sailing" provision —is not present here. A clear sailing provision refers to both an agreement for the payment of attorney's fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class," *Bluetooth*, 654 F.3d at 947 (cleaned up), and a provision whereby the defendant agrees "not object to an attorneys' fees-and-expense award of up to" a certain amount, *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1050 (9th Cir. 2019). Here, the attorney's fees come out of the common fund and the Settlement Agreement does not include language wherein Defendant agrees not to object to Plaintiffs' request for fees. "There is thus no clear sailing provision. Even if the

11

Settlement Agreement's silence on the issue could be construed as a clear sailing provision, given that amount of fees sought is less than Class Counsel's lodestar and the actual payout to Class Members is significant, the Court finds Defendant is not agreeing to pay Class Counsel excessive fees and costs in exchange for accepting an unfair settlement for the class.

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to the defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d at 948—is not present here. The Settlement Agreement is non-reversionary—all of the funds will be distributed to the Class Members or the *cy pres*.

Accordingly, notwithstanding the existence of at least one *Bluetooth* red flag, the Court finds that the Settlement Agreement did not result from, nor was it influenced by, collusion.

\* \* \*

In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel.  For each of these reasons, the Settlement Agreement passes muster under Rule 23(e) and final approval is appropriate.

## V. PAGA SETTLEMENT APPROVAL

"A PAGA representative action is . . . a type of qui tam action" in which a private plaintiff pursues "a dispute between an employer and the state LWDA on behalf of the state." *Iskanian v. CLS Transp. L.A., LLC*, 327 P.3d 129, 148 (Cal. 2014), *abrogated on other grounds*, by *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022). "[B]ecause a settlement of PAGA claims compromises a claim that could otherwise be brought by the state," courts must "review and approve any settlement." *Ramirez v. Benito Valley Farms, LLC*, No. 16-cv-04708-LHK, 2017 WL 3670794, at \*2 (N.D. Cal. Aug. 25, 2017) (quoting Cal. Lab. Code § 2699(l)(2)).  The Court previously analyzed the appropriateness of the PAGA settlement here and because no facts that would affect this analysis have changed since the Court preliminarily approved the class on December 14, 2023, this Order incorporates by reference the Court's prior analysis and finally approves the PAGA settlement.  (Dkt. No. 181 at 7-9.)

### VI. MOTION FOR ATTORNEY'S FEES, COSTS, AND INCENTIVE AWARDS

The Settlement Agreement provides "Class Counsel will apply to the Court for an award of not more than one third (1/3) of the Gross Settlement Amount as their Class Counsel Fees Payment, or One Million Two Hundred Thousand Dollars and Zero Cents ($1,200,000). (Dkt. No. 230 at 13.) The Settlement Agreement further provides for reimbursement of Class Counsel's litigation expenses up to $45,000, and reimbursement to the Settlement Administrator for "its reasonable fees and expenses related to administering this Settlement." (*Id*. at 13-14.) Finally, the Settlement Agreement provides the Class Representatives will each receive a $7,500 incentive award subject to Court approval. (*Id*.)

#### A. Attorney's Fees

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. Pro. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. In diversity actions such as this, state law applies to determine the right to fees and the method for calculating them. *See Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478-79 (9th Cir. 1995). Because Plaintiffs' underlying class claims are state law claims, the Court must apply California law on attorneys' fees. *See Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047 (9th Cir. 2002).

The California Supreme Court has held that courts have discretion to choose among two different methods for calculating a reasonable attorney's fee award. *See Laffitte v. Robert Half Int'l Inc*., 1 Cal. 5th 480, 504 (2016). The first is the "percentage method," when the fee is calculated "as a percentage share of a recovered common fund or the monetary value of [the] plaintiffs' recovery." *Id*. at 489. The second approach is "[t]he lodestar method, or more accurately the lodestar–multiplier method." *Id*. at 489. Under the lodestar method, the fee is calculated "by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate," then "increas[ing] or decreas[ing]" the lodestar figure based on "a variety of ... factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Id*. (citation omitted). "The choice of a fee calculation method is

1  generally one within the discretion of the trial court, the goal under either the percentage or
2  lodestar approach being the award of a reasonable fee to compensate counsel for their efforts." *Id*.
3  at 504. This approach aligns with the Ninth Circuit. *See Vizcaino*, 290 F.3d at 1047 ("Under Ninth
4  Circuit law, the district court has discretion in common fund cases to choose either the percentage-
5  of-the-fund or the lodestar method.").
6        Both the California Supreme Court and the Ninth Circuit recommend that whether a court
7  uses the lodestar or percentage-of-recovery method, the court should perform a cross-check using
8  the other method to confirm the reasonableness of the fee (e.g., if the percentage-of-recovery
9  method is applied, a cross-check with the lodestar method will reveal if the amount requested is
10  unreasonable in light of the amount of work done).  *See, e.g.*, *Bluetooth*, 654 F.3d at 944-45;
11  *Laffitte*, 1 Cal. 5th at 504 ("A lodestar cross-check ... provides a mechanism for bringing an
12  objective measure of the work performed into the calculation of a reasonable attorney fee.").

### 1. Percentage-of-Recovery Method

14  Plaintiffs request one-third of the gross settlement amount or $1,200,000 in attorney's fees.
15  The Ninth Circuit uses a 25 percent of the fund "benchmark" for awarding fees. *Bluetooth*, 654
16  F.3d at 942. "An adjustment, either up or down, must be accompanied by a reasonable explanation
17  of why the benchmark is unreasonable under the circumstances." *Reyes v. Experian Information*
18  *Services, Inc.*, 856 Fed. Appx. 108, 110 (9th Cir. 2021) (cleaned up). The Court finds that an
19  upward adjustment for a fee award of 33 percent of the common fund is appropriate for several
20  reasons.
21        First, cases with a relatively small fund of under $10 million will "often result in fees
22  above 25%." *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008); *see*
23  *also Alvarez v. Farmers Ins. Exch.*, No.14-cv-00574-WHO, 2017 WL 2214585, at *3 (N.D. Cal.
24  Jan. 18, 2017) ("Fee award percentages generally are higher in cases where the common fund is
25  below $10 million.") (citing cases).
26        Second, as discussed above, there were no objections either to the settlement or the
27  attorney's fee request, and no requests to opt-out were received.
28        Third, Class Counsel achieved substantial results in this case.  "The net settlement fund

1  will provide the Class Members with approximately 70 percentage recovery of their reporting pay
2  time claim", which is "the gravamen of the litigation here." (Dkt. No. 242 at 20.)  This not a
3  claims-made settlement and 100% of Class Members will receive a payment with an average
4  individual settlement payment of $6,661.86, and 75 of the 341 Class Members will receive a
5  settlement payment in excess of $10,000.00. (Dkt. No. 246 at ¶ 7.)  In addition, the state will
6  receive $37,500 in funds through the settlement of the PAGA claim, and the aggrieved employees
7  will collectively receive another $12,500.  (Dkt. No. 242 at 21.)

Finally, as explained below, a 33 percent award is supported by the lodestar cross-check.

### 2. **Lodestar Method**

Class Counsel calculates their lodestar at $1,809,105 (after exercising billing judgment), which is 67 percent of the fees sought here.  This amount represents 3,579.6 hours of work performed by two firms, which can be broken down as follows:

- 3,068.9 hours billed by nine attorneys and one paralegal at Weinberg, Roger & Rosenfeld for a total lodestar of $1,365,632, and
- 510.7 hours by three attorneys at Leonard Carder for a total lodestar of $443,462.

(Dkt. No. 242-5 at ¶ 25; Dkt. No. 242-6 at ¶ 43.)  Counsel has exercised billing judgment to eliminate time billed by attorneys and paralegals who billed less than 20 hours for Weinberg, Roger & Rosenfeld, and less than 10 hours for Leonard Cohen.  (Dkt. No. 242-5 at ¶ 25; Dkt. No. 242-6 at ¶ 44.)  Although Weinberg, Roger & Rosenfeld law clerks performed substantial legal research and worked with Class Members, all law clerk time was excluded.  (Dkt. No. 242-6 at ¶ 44.)  These numbers also do not include any time billed after December 31, 2023 or "countless" brief telephone calls with co-counsel and inter-office meetings.  (Dkt. No. 242-5 at ¶ 25; Dkt. No. 242-6 at ¶ 44.)

"Affidavits of the plaintiff['s] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiff['s] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  Class Counsel's hourly rates are supported by their own declarations attesting to similar awards in prior cases as well as a

declaration from a third-party attorney familiar with wage and hour class litigation and the firms involved in this case. (Dkt. No. 242-5 at ¶¶ 11-12; Dkt. No. 242-6 at ¶ 40; Dkt. No. 242-7 at ¶¶ 5-6.) Further, the rates requested in this case are within the range of rates approved in wage and hour litigation in this District. *See Joh v. Am. Income Life Ins. Co*., No. 18-CV-06364-TSH, 2021 WL 66305, at *8 (N.D. Cal. Jan. 7, 2021) (collecting cases approving similar rates in wage and hour class actions). While the Court need not and does not decide that the exact rates requested by counsel are reasonable, they are at least within the range of reasonableness required to use the lodestar figure as a cross check. *Id.* at *7 ("Where a lodestar is merely being used as a cross-check, the court may use a rough calculation of the lodestar." (internal quotation marks and citation omitted)).

Class Counsel also submitted detailed declarations describing the myriad of work performed in this action over the last five years and documenting "project-based tranches" of time entries. (Dkt. No. 242-5 at ¶¶ 14-2, 26; Dkt. No. 242-6 at ¶¶ 20-38, 45.) Upon review, the reported hours spent litigating this case are not plainly unreasonable.

Finally, the requested award of $1,200,000 is approximately 67 percent of the reported $1,809,105 lodestar. "A negative multiple strongly suggests the reasonableness of a negotiated fee." *Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc*., No. 19-CV-07087-DMR, 2021 WL 4133860, at *6 (N.D. Cal. Sept. 10, 2021) (cleaned up). The lodestar cross-check thus supports the fee award here.

***

In sum, both the percentage-of-recovery and the lodestar analyses support the requested fee award of $1,200,000 here.

**B.     Costs**

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (cleaned up). Plaintiffs request $44,617.98 in litigation costs and $11,500 in settlement administration costs. (Dkt. No. 242-5 at ¶ 27; Dkt. No. 242-6 at ¶ 48; Dkt. No. 246 at ¶ 7.) These costs are all well documented and reasonable. (*Id*.)

Accordingly, the Court awards $56,117.98 in combined litigation and settlement administration costs.

### C. Class Representative Incentive Awards

"Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one"). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id*. at 960 (internal quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

In determining whether an incentive award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)). A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to

Accordingly, the Court awards $56,117.98 in combined litigation and settlement administration costs.

### C. Class Representative Incentive Awards

"Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one"). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id*. at 960 (internal quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

In determining whether an incentive award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)). A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to

justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). Further, district courts must evaluate each incentive award individually. *See Staton*, 327 F.3d at 977.

Plaintiffs Marco DiMercurio, Charles Gaeth, John Langlitz, and Malcolm Synigal seek incentive awards of $7,500 each for a total of $30,000. Plaintiffs have each spent approximately 60 hours working on this case which includes time spent providing documents, sitting for deposition, preparing declarations in support of motions, and preparing for and attending three settlement conferences. (Dkt. Nos. 242-1 at ¶¶ 6-13 (Mr. DiMercurio attesting he spent 63 hours on this case); Dkt. No. 242-2 at ¶¶ 6-13 (Mr. Gaeth attesting he spent 57 hours on this case); Dkt. No. 242-3 at ¶¶ 6-13 (Mr. Langlitz attesting he spent 58 hours on this case); Dkt. No. 242-4 at ¶¶ 6-13 (Mr. Synigal attesting he spent 59 hours on this case).) The Court is satisfied the class representatives' individual contributions to this case warrant an incentive award. The amount of the award here is not excessive when compared either to the class representatives' individual contributions or the individual Class Member recovery which averages $6,661.98 with over 20 percent of the class receiving settlement payments in excess of $10,000. (Dkt. No. 246 at ¶ 7.) Further, the named Plaintiffs agreed to a general release of any and all known and unknown claims arising out of their employment or relationship with Defendant including all unknown claims covered by California Civil Code § 1542. (Dkt. No. 230 at 20.) Under the circumstances here the requested $7,500 incentive award is reasonable and does not "undermine the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc*., 715 F.3d 1157, 1163 (9th Cir. 2013). Accordingly, the Court awards Plaintiffs Marco DiMercurio, Charles Gaeth, John Langlitz, and Malcolm Synigal $7,500 each.

## CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' motion for final approval of the parties' class action settlement. In addition, the Court GRANTS Plaintiffs' motion for attorney's fees and costs; specifically, the Court awards the following: $1,200,000 in attorney's fees; $56,117.98 in combined litigation and settlement administration costs; and $30,000 for incentive awards for the named Plaintiffs ($7,500 each).

The Court holds this Order in abeyance for 90 days to allow time for any state or federal agencies to object to the settlement under CAFA. At the conclusion of this period, the parties shall file a notice with the Court indicating whether any objections have been received. If not, this Order will become final in accordance with the parties' stipulation. (Dkt. No. 248.)

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website." *See id*.

This Order disposes of Docket Nos. 242, 244.

**IT IS SO ORDERED.**

Dated: May 9, 2024

_____
JACQUELINE SCOTT CORLEY
United States District Judge